FELDMAN v GREEN

Docket No. 65930. Submitted December 19, 1983, at Detroit.—Decided October 16, 1984. Leave to appeal applied for.

    Jack M. Feldman brought an action against Abe Green and others in the Oakland Circuit Court alleging tortious interference with the contractual relationship between himself and American Medicorp, Inc. (AMI). Plaintiff had an option to purchase three nursing homes from AMI. Prior to the expiration of the option, defendants purchased the nursing homes. Plaintiff obtained a judgment against defendants. On appeal, the Court of Appeals, in an unpublished per curiam opinion, Docket No. 43069, decided April 29, 1980, reversed because of an error in the jury instructions and remanded for a new trial. On remand, the defendants moved for summary judgment based on the lack of any genuine issue of material fact, arguing that the extent of their "interference" was limited to making a more attractive offer in price and terms, that plaintiff had failed to allege or demonstrate that defendants resorted to illegal, unethical, or fraudulent conduct in acquiring the property, and that, because plaintiff's contract was not specifically enforceable, they were permitted a greater latitude in the means of interference such that there remained no genuine issue of material fact on the issue of whether they used unlawful means of competition in acquiring the nursing homes. The court, Alice L. Gilbert, J., granted summary judgment for defendants. Plaintiff appealed. *Held:*

    1. The trial court properly considered all of the plaintiff's allegations in ruling on the motion.

    2. A plaintiff who alleges tortious interference with a contractual or business relationship, in order to withstand a motion for summary judgment, must allege the intentional doing of either a per se wrongful act or a lawful act with malice and unjusti-

REFERENCES FOR POINTS IN HEADNOTES

[1] 73 Am Jur 2d, Summary Judgment §§ 26, 27.

[2] 45 Am Jur 2d, Interference §§ 1 *et seq.,* 55.

    Liability for interference with at will business relationship. 5 ALR4th 9.

fied in law for the purpose of invading plaintiff's contractual rights or business relationship. This plaintiff did not do.

Affirmed.

1. JUDGMENTS — SUMMARY JUDGMENT — COURT RULES.

A motion for summary judgment based on a lack of a genuine issue as to any material fact tests whether there is factual support for a claim; in passing on the motion, the court must consider the pleadings, affidavits, depositions, admissions and other documentary evidence then available to it, and in granting the judgment the court must be satisfied that it is impossible for the claim asserted to be supported by evidence at trial (GCR 1963, 117.2[3]).

2. TORTS — INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONSHIPS.

A plaintiff who alleges tortious interference with a contractual or business relationship, in order to withstand a motion for summary judgment, must allege the intentional doing of either a per se wrongful act or a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship.

*Kratze & Tompkins, P.C.* (by *David R. Kratze*), for plaintiff.

*Hyman, Gurwin, Nachman, Friedman & Winkelman* (by *Irwin M. Alterman* and *Richard Bisio*), for defendants.

Before: GRIBBS, P.J., and WAHLS and HOOD, JJ.

PER CURIAM. Plaintiff appeals from an order of the Oakland County Circuit Court which granted defendants' motion for summary judgment. The trial court held that there existed no genuine issue of material fact as to the allegation that defendants tortiously interfered with plaintiff's contractual dealings to purchase real property. This Court has more than a passing familiarity with the dispute represented here, as the following recitation will make evident.

On September 30, 1974, plaintiff filed suit

against defendants alleging tortious interference with the contractual relationship between himself and American Medicorp, Inc. (AMI). AMI was the owner of a group of three nursing homes in the Detroit metropolitan area. Both plaintiff and defendants were engaged in discussions with AMI, each on their own behalf, to purchase the nursing homes.

On September 4, 1974, plaintiff and AMI executed a 30-day option to purchase the nursing homes. The agreement provided, *inter alia,* that, if either party should default under the terms of the purchase agreement, the other party would be entitled to $50,000 liquidated damages. The plaintiff paid $25,000 for the option and had the right to extend the option another 60 days for an additional $25,000.

On September 27, or 28, 1974, before the termination of plaintiff's option to purchase the nursing homes, defendants purchased them. When plaintiff received information of the transaction, he promptly filed suit. In addition to the suit against defendants for tortious interference with a contractual relationship, plaintiff sought specific performance from AMI, and the appointment of a receiver.

The unpublished opinion of this Court (Docket No. 43069) issued on April 29, 1980, aptly summarizes the events which occurred following the filing of the action by the plaintiff:

"* * * The circuit judge issued an ex parte restraining order and appointed a receiver for the nursing homes. An emergency application for leave to appeal filed by defendants was denied. Both sides moved for summary judgment on the specific performance claim and the circuit judge granted Feldman's motion, holding the option agreement was specifically enforceable.

"There next followed a series of events, the character-

ization of which is disputed by the parties, concerning efforts by the seller and the defendants to unwind their transaction so that Feldman could be free to acquire the homes in accordance with the summary judgment of specific performance.

"In late January, 1975, defendants filed a counterclaim to place a constructive trust on the proceeds should Feldman resell to a third party any of the homes he was to acquire. The counterclaim was filed pursuant to an unopposed motion and court order. The counterclaim related to an alleged impropriety by Feldman in connection with loan applications each side had made at the same bank during the summer of 1974 when they were each seeking to obtain financing for their proposed purchases. The heart of the counterclaim, as the trial evidence showed, was a document Feldman submitted to the bank which was a purported agreement in principle between Feldman and the owner. He had no such agreement and Feldman affixed signatures purported to be those of officials of the owner. Defendants claimed Feldman never would have received a loan commitment but for this improper agreement, and that they would have been able to buy the homes free of a competing bid from him. Feldman introduced evidence at trial and argued that the document had no effect on the bank's business decisions and that, in any event, a line was placed through the signatures, rendering them ineffectual.

"Immediately after the counterclaim was filed, Feldman convinced the circuit judge that the pendency of the counterclaim, and the accompanying *lis pendens,* would, as a practical matter, prevent Feldman from acquiring the three nursing homes from the seller under a scheduled closing date and from his planned resale of one nursing home to a third party. Feldman filed a motion for summary judgment and the circuit court heard argument the next day. The judge dismissed the constructive trust claim but left a damage count of the counterclaim in the case. This time the Court of Appeals stayed the matter, ordered briefs and oral argument, but eventually denied leave to appeal. Judge O'HARA dissented from the denial of leave to appeal on the ground that summary judgment was

improper. Feldman eventually settled with the owner, purchased the homes, and continued this action against the defendants for damages.

"Feldman was permitted to file a supplemental complaint for abuse of process and slander of title arising out of the filing of the counterclaim and the notice of *lis pendens.* The circuit judge later dismissed these claims before the case went to the jury, but he permitted Feldman to argue the filing of the constructive trust counterclaim was an additional act of interference with his contract."

The jury at trial found defendants liable for tortiously interfering with the contractual relationship between plaintiff and AMI. Plaintiff was awarded $500,000 in damages.

This Court reversed the award and remanded the case for a new trial. This result was based upon the error of the trial judge in submitting the case to the jury on. the instruction that plaintiff was entitled to specific performance of the option agreement as a matter of law:

"The circuit judge committed a material error in holding, throughout the pendency of this action and at trial, that the agreement permitted Feldman to obtain specific performance *as a matter of law.* Paragraph 9A, inserted at the request of Feldman, states that if the seller defaults, the option to purchase shall 'cease and terminate', and upon a tender of money, which was made here, there will be no 'further loss, cost, damage, right or remedy in favor of either party'. The sale by the owner to the defendants was certainly a default with respect to the Feldman agreement and specific performance is obviously a remedy. However, by an interpretation of 9A it is clear that the parties intended to preclude specific performance. The circuit court seemed to suggest that the only way to avoid specific performance in an agreement is to specifically address that issue. Contractual intent cannot be based exclusively on such formalisms. Since the provision has no

patent ambiguity, and Feldman raised no latent ambiguity suggesting an intent to permit specific performance in this situation, we conclude specific performance was not an available remedy in his option.

\* \* \*

"We conclude that the trial court's error on the issue of specific performance was critical and precluded a proper consideration by the jury of the claim of tortious interference."

This Court made the following observation concerning plaintiff's claim:

"However, simply because a contract may not be specifically enforceable does not necessarily give defendants the right to make any manner of interference with impunity from a claim of tortious interference. There is some question in Michigan whether an interfering party may rely on a contract defense to defeat a tortious interference action, *Northern Plumbing & Heating, Inc v Henderson Brothers, Inc,* 83 Mich App 84, 92; 268 NW2d 296 (1978), but we believe the better view to be that in proper circumstances a tortious interference action may arise. On the other hand, the defendant in such a situation does have a greater latitude in the means of interference permitted.

\* \* \*

"\* \* \* The claim of tortious interference may be successfully established even though we hold the instant contract is not specifically enforceable: however, the ruling by the lower court gave the contract a quality it did not have and this fact, alone, worked a material prejudice against appellants."

On remand, defendants made a motion for summary judgment based upon GCR 1963, 117.2(3). Defendants argued that the extent of their "interference" was limited to making a more attractive offer in price and terms and that plaintiff had failed to allege or demonstrate that defendants resorted to illegal, unethical, or fraudulent con-

duct in acquiring the property. Defendants also argued that, because plaintiff's contract was not specifically enforceable, they were permitted a greater latitude in the means of interference such that there remained no genuine issue of material fact on the issue of whether they used unlawful means of competition in acquiring the nursing homes.

Plaintiff, in response, denied that the opinion of this Court held that his contract was not specifically enforceable and denied that defendants' sole inducement was a better offer of price and terms to AMI. Plaintiff argued further that a question of fact existed as to the defendants' acts notwithstanding the greater latitude permitted in the means of interference.

The trial court granted defendants' motion. The opinion of the trial judge set forth the following reasoning:

"According to plaintiff, the activities of the Shiffman Group were suspicious, surreptitious, clandestine and unbusinesslike. He maintains that this is sufficient to lead to the presumption that defendants' negotiations with AMI were improper. However, it is clear that in order to maintain a claim for tortious interference with contractual relations, plaintiff must demonstrate that defendants secured the contract by illegal means. *Weitting v McFeeters;* 104 Mich App 188, 197-198; 304 NW2d 525 (1981), citing with approval Judge O'HARA's dissent in *Meyering v Russell,* 393 Mich 770 (1974), *rev'g* 53 Mich App 695; 220 NW2d 121 (1974).

"Plaintiff has failed to meet this test. Merely because he considers the Shiffman Group's actions suspicious or unbusinesslike does not render them unlawful or illegal. Feldman is wholly unable to allege the supposed illegal inducements utilized by defendants, let alone demonstrate their existence by competent factual evidence.

\* \* \*

"Most important *[sic]*, plaintiff stated under oath, at both his deposition and at trial, that his claim was based solely upon the fact that the Shiffman Group made a more attractive offer to AMI. Specifically, he stated that defendants offered AMI more than he had offered.

\* \* \*

"\* \* \* Sound public policy dictates that as long as a seller has not entered a binding contract or the prospective buyer has not utilized improper inducements, the seller should be encouraged to accept the offer most favorable to him."

On appeal, plaintiff presents two arguments: 1) that the trial court erred in ruling on defendants' motion for summary judgment without giving consideration to plaintiff's second theory of recovery; and 2) that the trial court erred in granting defendants' motion on the basis that improper or illegal means of competition must be shown.

I

A motion for summary judgment based on the absence of any genuine issue of material fact tests whether there is factual support for the claim. *Lipton v Boesky,* 110 Mich App 589, 598; 313 NW2d 163 (1981). The court must consider the pleadings, affidavits, depositions, admissions, and other documentary evidence then available to it. *Rizzo v Kretschmer,* 389 Mich 363, 374; 207 NW2d 316 (1973); *Fry v Ionia Sentinel-Standard,* 101 Mich App 725, 728; 300 NW2d 687 (1980). Before granting summary judgment, the court must give the benefit of every reasonable doubt to the party opposing the motion and must be satisfied that it is impossible for the claim to be supported at trial because of some deficiency which could not be overcome. *Rizzo, supra,* p 372; *Peeples v Detroit,* 99 Mich App 285, 293; 297 NW2d 839 (1980).

We find that plaintiff's argument is without merit. He charges that the trial court overlooked a second theory of recovery when it granted defendants' motion. The record establishes that the theory was based upon the defendants' action of filing a counterclaim to place a constructive trust on the proceeds of the nursing homes in the event a third party purchased them. In the first trial, plaintiff filed a supplemental complaint for abuse of process and slander of title with respect to the defendants' counterclaim. The trial judge dismissed the claims before final arguments of the parties. But plaintiff was permitted to argue that these acts of defendants constituted an additional act of interference.

On remand, the plaintiff included the defendants' filing of the counterclaim in the list of acts which, he argued, constituted an actionable claim of interference. The trial judge rejected the plaintiff's argument. The judge reduced the voluminous record to one issue: "whether plaintiff alleged acts which raised a question of material fact as to whether defendants wrongfully induced (AMI) to sell its nursing homes to them rather than to Feldman". The trial judge cited in the opinion only a portion of the acts alleged by plaintiff as "improper inducements" utilized by defendants but expressly noted that the list was not exclusive in prompting her conclusion. On a whole, the judge found nothing to "demonstrate the unlawful means of competition necessary to sustain a claim for tortious interference". Likewise, we find nothing improper in the opinion to support plaintiff's contention that something was overlooked by the trial judge. Moreover, in our review of the record it is clear that the trial court found plaintiff's other allegations without factual substance in the face of plaintiff's repeated admission under oath

that his claim against defendants was based solely on the fact that defendants made a better offer of price and terms to AMI. It is clear that the trial court found this admission fatal to plaintiff's cause. We find that the trial court considered all of plaintiff's allegations in granting summary judgment.

## II

Plaintiff contends in his second argument that the trial judge improperly applied the law in granting summary judgment. Plaintiff argues that the trial judge improperly required that his claim demonstrate interference on the part of the defendants that was illegal and unlawful. Plaintiff argues that acts which are inherently actionable or illegal are not a prerequisite to liability and that the application of such a standard by the trial judge requires reversal.

The apparent premise of this argument is that, under a standard which does not require per se illegal acts by an interferor, plaintiff would withstand a summary disposition of his case. We agree with plaintiff's argument that per se illegal acts by an interferor are not a prerequisite to liability under the tort of interference with contractual or business relations. However, we hold that plaintiff herein has not sufficiently raised a genuine issue of material fact by his allegations. We hold, consistently with prior rulings by the Supreme Court of this state, that one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the intentional doing of a lawful act with malice and unjustified in law for the purpose of invading plaintiff's contractual rights or business relationship. Under the latter instance,

plaintiff necessarily must demonstrate, with specificity, affirmative acts by the interferor which corroborate the unlawful purpose of the interference. Our reading of the record reveals a conspicious failure by the plaintiff to raise a genuine issue of material fact as to whether defendants' means of competition for the nursing homes unjustifiably and maliciously invaded his contractual relationship with AMI. Therefore, we affirm the opinion of the trial judge.

We are hesitant, however, to leave the matter so hastily. We feel a review of the case law on this matter will be both timely and instructive.

In our view, recent decisions by this Court have not distilled the essence of the law, which we find has been consistently applied in the Supreme Court decisions discussed below.[1] See *Meyering v*

---

[1] The essence of the tort has changed very little in form from that applied in England in the Nineteenth Century and adopted in the United States in the latter part of the century. The Supreme Court of New Jersey provided a succinct, historical exposition of the underlying principle for the tort in *Louis Schlesinger Co v Rice,* 4 NJ 169; 72 A2d 197, 202-203 (1950):

"'* * * Malicious interference with one's business is actionable. The luring away by devious, improper and unrighteous means of the customer of another falls into this category. If the disturbance or loss to one in his business is a mere incident 'of competition, or the exercise of like rights by others, it is *damnum absque injuria,* unless some superior right by contract or otherwise is interfered with. But if it comes from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing.' *Walker v Cronin,* 107 Mass 555 (1871). An injury to a person's business 'by procuring others not to deal with him, or by getting away his customer, if unlawful means or employed, such as fraud or intimidation, or if done without justifiable cause, is an actionable wrong.' * * * Merely to persuade a person to break his contract may not be wrongful 'in law or in fact;' but if 'the persuasion be used for the indirect purpose of injuring the plaintiff, or of benefiting the defendant at the expense of the plaintiff, it is a malicious act, which is in law and in fact a wrong act, and therefore a wrongful act, and therefore an actionable act if injury ensues from it.' *Bowen v Hall,* LR 6 QBD 333; 50 LJQB 305; 1 Eng Rul Cas 717.

\* \* \*

*Russell,* 53 Mich App 695; 220 NW2d 121 (1974), *rev'd* 393 Mich 770; 224 NW2d 280 (1974), *appeal after remand,* 85 Mich App 547; 272 NW2d 131 (1978). *Dassance v Nienhuis,* 57 Mich App 422; 225 NW2d 789 (1975); *Northern Plumbing & Heating, Inc v Henderson Brothers, Inc,* 83 Mich App 84; 268 NW2d 296 (1978), *lv den* 405 Mich 845 (1979); *Association Research and Development Corp v CNA Financial Corp,* 123 Mich 162; 333 NW2d 206 (1983). Compare *Weitting v McFeeters,* 104 Mich App 188; 304 NW2d 525 (1981). As a result, the bar has argued that a conflict exists in this Court on the issue of what constitutes an actionable interference with a contractual or business relationship. We find no conflict. However, in *Dassance, supra,* this Court erroneously applied the reasoning of the majority in *Meyering v Russell, supra,* apparently before receiving knowledge of the Supreme Court's reversal which was announced just days before *Dassance* was decided. *Dassance* is not good law on the question now before us.

## III

Liability for tortiously interfering with the contractual relationship of others was first recognized in Michigan in *Morgan v Andrews,* 107 Mich 33; 64 NW 869 (1895). The Supreme Court in *Morgan*

"Malice in the legal sense is the intentional doing of a wrongful act without justification or excuse. And a 'wrongful act' is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right. This is the English definition which has long prevailed in this state. *Bromage v Prosser,* 4 B & C 247; 10 ECL 321; 107 Reprint 1050; 1 C & P 475; *Quinn v Leathem, supra; Leith & Co v Leydon* (1931) AC 90; *British Homophone v Kunz* (1935) 150 LT 589; *British Industrials Plastics v Ferguson* (1940) 162 LT 313; *Brennan v United Hatters,* 73 NJL 729, 65 A 165, 9 LRA, NS, 254, 118 Am St Rep 727, 9 Ann Cas 698 (E & A 1906). Malice may be inferred from the absence of just cause or excuse." Compare 4 Restatement Torts, 2d, §§ 766-767.

found the defendant interferor liable to plaintiff for persuading a purchaser under contract with plaintiff to reject a machine which plaintiff designed and built. The Court held that defendant, as a stockholder with an interest in the purchaser's company, could freely express his negative opinion about the plaintiff's machine but that he had overreached that interest by acting in a malicious and unlawful manner for the purpose of procuring the rejection of the machine. The Court noted that one could not "prevail where the party sought to be charged was acting in the lawful exercise of some distinct right" and not with wrongful intent to do harm to the plaintiff. 107 Mich 39. However, the Court found that the following evidence raised a question of fact on the issue of liability:

"The defendant admits that he advised Glover & Bowling against the machine. Many times, when plaintiff desired goods for the purpose of testing the machine, he refused to furnish them, though he had been directed by Glover & Bowling to furnish them. According to some of the witnesses, he constantly put obstacles in the way of the plaintiff, in his work on the machine and in testing it. Glover & Bowling would apparently be pleased with the tests made, and, after a few moments' conversation with Andrews, the latter would almost immediately thereafter come to plaintiff, and say: 'You need not do anything further with this. There is a question about it. You better let them alone.' It would not profit the parties or the profession to set out at length the many facts and circumstances detailed in the record, showing the conduct of the defendant towards the plaintiff and the machine. If the testimony be true, he was in the habit of speaking of and to the plaintiff in the most slighting terms, constantly disparaging the machine and its work, when the tests were being made to induce Glover & Bowling to accept it. There is little doubt, from the testimony, that Glover & Bowling should have accepted it; but, under the contract, as held

in the trial of the case against Glover & Bowling, they had the right to reject it without giving any reason therefor. In the present case, the only theory upon which the plaintiff had a right to recover was that they would have accepted it but for the fraud and deceit of the defendant. We think there is evidence in the case from which the jury might infer that it was due to the misconduct of the defendant that the machine was not accepted." 107 Mich 37-38.

In *Wilkinson v Powe,* 300 Mich 275; 1 NW2d 539 (1942), the Supreme Court reinstated a jury verdict for the plaintiff which found the defendant interfe- ror liable for procuring a breach of plaintiff's contract to haul the milk of certain farmers. De- fendant owned a creamery. He informed certain farmers that the creamery would not accept their milk unless the milk was hauled by defendant's own trucks. The farmers discontinued their rela- tionship with the plaintiff and let the defendant haul their milk. The Court stated that plaintiff could not prevail if defendant was in the exercise of a superior or absolute right "to refuse to accept further delivery of milk from the plaintiff". In such a case "no justification was necessary". 300 Mich 282. The plaintiff alleged that defendant's object or purpose was to prevent plaintiff "from protecting the farmers on his routes from false, fraudulent, and dishonest practices in the testing, weighing and price paid for milk." 300 Mich 280. Defendants argued that they took over the routes because plaintiff was late with his deliveries and delivered the milk in an unsatisfactory condition. At trial, the trial judge granted a judgment not- withstanding the jury verdict based upon his view that the defendant had a lawful "right to discon- tinue its source of supply at any time" and there- fore "lawful action, not unlawful action, then elim- inated any value the [plaintiff's delivery] routes may have had". 300 Mich 281.

However, the Court held that plaintiff's allegations in light of the evidence of the letters established a prima facie case which properly went to the jury. 300 Mich 283. In support of the verdict, the Court made the following comment:

" 'The great weight of authority in this country and England is to the effect that, if. A has a legal contract with B, either for the rendition of service or any other purpose, and C, having knowledge of the existence thereof, intentionally and knowingly, and without reasonable justification or excuse, induces B to break the contract, by reason of which A sustains damages, an action will lie by A against C to recover the same. * * * The action of C is malicious, in that, with the knowledge of A's rights, he intentionally and knowingly and for unworthy or selfish purposes, destroys them by inducing B to break his contract. It is a wrongful act, done intentionally, without just cause, or excuse, and from this a malicious motive is to be inferred. This does not necessarily mean actual malice or ill will, but the intentional doing of a wrongful act without legal or social justification.'

* * *

"If the defendants in the instant case had merely refused to accept further delivery of milk by plaintiff, they would have been clearly within their legal rights, although this would have resulted in a breach of contract between plaintiff and the farmers. But defendants did more. Their letters of May 29th and June 1st show active solicitation of a breach of the contract and their refusal to accept delivery of milk was merely another step in bringing about the breach.

* * *

"[D]efendants in the instant case refused to purchase from the farmers unless they broke their contract with plaintiff and thereby brought about the breach.

*"Defendants' refusal to accept further deliveries of milk by plaintiff was wrongful in the light of the evidence in the instant case because it was done to accomplish an unlawful purpose, i.e., to bring about a*

*breach of contract.* It therefore follows that the problem of proximate cause disappears from consideration in the case. Defendants cannot be heard to say that they should not be held liable for the injury caused plaintiff by their unlawful acts merely because they could have caused the same injury by a lawful act." 300 Mich 282-285. (Citations omitted, emphasis supplied.)

In *Bahr v Miller Brothers Creamery,* 365 Mich 415; 112 NW2d 463 (1961), the Court elucidated the "unlawful purpose" concept quoted above in *Wilkerson.*

In *Bahr,* the plaintiff milk supplier brought suit against defendant for tortiously procuring a breach between plaintiff and three drivers who previously had been milk route drivers handling plaintiff's products. The drivers discontinued carrying plaintiff's products and entered into a more profitable arrangement with defendant. The trial court granted defendant's motion for judgment notwithstanding the verdict of the jury which awarded plaintiff damages. The trial judge made the following findings in support of the order:

"There is absolutely no evidence of any fraud or misrepresentation on the part of any of the defendants, no force or no coercion, no inducements of any kind other than those held out to all other Miller Brothers distributors. No special inducements were held out to the drivers in question. The fact that Miller Brothers arrangements with their independent drivers was more favorable to the drivers than was given by the Utica Dairy to their drivers might be an inducement, but a perfectly legal one and open to all drivers." 365 Mich 417-418.

The Supreme Court affirmed the reasoning of the trial judge. The Court reasoned that acts are unlawful when "done to accomplish an unlawful purpose". 365 Mich 423. Citing from another juris-

diction, the Court noted that a party's otherwise lawful acts may be actionable when "under the guise of competition [they] actively and affirmatively induce the breach of a competitor's contract". 356 Mich 424. If the plaintiff proves that the interferor "intentionally and actively induced the breach", an otherwise lawful act may be unlawful. 365 Mich 425.

In sum, a genuine issue of material fact is raised when a plaintiff demonstrates that the interferor's "competition" was merely a guise to "induce the breach of an competitor's contract in order to secure an economic advantage over that competitor". *Bahr, supra,* p 424, quoting from *Imperial Ice Co v Roissier,* 18 Cal 2d 33; 112 P2d 631 (1941). Where evidence of an unlawful purpose is absent, the policy of this state will not condemn a party in the proper exercise of a legal right.[2]

---

[2] The commentary by the American Law Institute in its Restatement Torts, 2d, provides additional guidance in analyzing plaintiff's claim. Section 768 is particularly instructive:

"(1) One who intentionally causes a third person not to enter into a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if

"(a) the relation concerns a matter involved in the competition between the actor and the other and

"(b) the actor does not employ wrongful means and

"(c) his action does not create or continue an unlawful restraint of trade and

"(d) his purpose is at least in part to advance his interest in competing with the other.

"(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will."

In other jurisdictions see *Mardirosian v American Institute of Architects,* 474 F Supp 628 (DDC 1979); *Dolton v Capital Federal Savings & Loan Ass'n,* 642 P2d 21 (Colo App, 1981); *Beldon Corp v Internorth, Inc,* 90 Ill App 3d 547; 413 NE2d 98 (1980); *United Wild Rice, Inc v Nelson,* 45 Ill Dec 765; 313 NW2d 628 (Minn, 1982); *M & M Rental Tools, Inc v Mechem, Inc,* 94 NM 499; 612 P2d 241 (NM App, 1980); *Guard-Life Corp v S Parker Hardware Manufacturing Corp,* 50 NY2d 183; 406 NE2d 445 (1980); *Ron Tonkin Gran Turismo,*

The paucity of plaintiff's allegations in the present case is readily apparent when set against the foregoing precedent. Plaintiff admits that the sole basis for bringing the complaint rested in the fact that defendants had outbid and outmaneuvered him in purchasing the nursing homes. The law in Michigan has not been expanded to adjudge liability on this basis. This fact was made clear in *Meyering v Russell,* 53 Mich App 695; 220 NW2d 121 (1974), *rev'd* 393 Mich 770; 224 NW2d 280 (1974), *appeal after remand* 85 Mich App 547; 272 NW2d 131 (1978). In *Meyering,* the Supreme Court summarily reversed a ruling by this Court which affirmed a judgment against a defendant interferor who purchased real property which the plaintiff had previously contracted to buy. The evidence in support of the judgment revealed that defendant obtained the property because the seller chose to accept the defendant's better offer of price and terms. This Court found the evidence sufficient:

"Today, liability may be found if the interference is by inducement or is purposeful interference.

*      *      *

"Appellant effectively persuaded Russell to breach his contract with Meyering by offering more attractive terms." 53 Mich App 705-705.

However, Justice O'HARA, retired and sitting by assignment, disagreed with the assessment of the majority, and the Supreme Court summarily reversed in accord therewith.

"I do not agree that the testimony and exhibits would support a permissible inference by the trier of fact that

*Inc v Wakehouse Motors, Inc,* 46 Or App 199; 611 P2d 658 (1980); *Allied Security, Inc v Security Unlimited, Inc,* 265 Pa Super 297; 401 A2d 1219 (1979).
See also 6 ALR4th 195, and 5 ALR4th 9.

defendant Deitz tortiously sought to thwart consummation of the contract between Meyer and Russell.

"Other than the perfectly legal act of making an offer to purchase the involved property with knowledge of the Meyering land contract nothing appears of record which would indicate that Deitz resorted to any unlawful methods of competition or used illegal means to obtain the property from Russell at Meyering's expense.

"Where 'dickering' as we know the term in our system is going on there is nothing legally impermissible in trying to better an offer that has had conditional acceptance only.

"To me there must be more than simple outbidding, and even outmaneuvering. A free economic society can be so hampered by limitations upon the exercise of business judgment or acumen that backyard discussions can grow into executed contracts supporting actions for tortious interference.

"I don't see anything defendant Deitz did in this case other than make a more acceptable offer to the fee owner of a parcel of realty." 53 Mich App 709-710.

## IV

We hold that one who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another.

In the present case, plaintiff's claim of interference is untenable. It cannot survive in contract, for we have previously held the contract between AMI and plaintiff was not specifically enforceable. See also *Weitting v McFeeters,* 104 Mich App 188, 196; 304 NW2d 525 (1981). Without specific allegations as to an unlawful purpose, we cannot say that the defendants overreached the bounds of interference permitted.

The claim has no vitality apart from the contract because plaintiff has failed to demonstrate that defendants "took any action which amounts to tortious interference with an advantageous business relationship". *Northern Plumbing & Heating, Inc v Henderson Brothers, Inc,* 83 Mich App 84, 96; 268 NW2d 296 (1978) (DANHOF, C.J., *dissenting), lv den* 405 Mich 845 (1979). Also see *Weitting, supra.* Otherwise stated, the placing of another offer to purchase is not per se a violation. *Meyering, supra,* 53 Mich App 709-710.

The analysis of the trial judge was correct. The granting of summary judgment was proper and is hereby affirmed.