# STATE OF MICHIGAN

# COURT OF APPEALS

GEORGE JOHN BOLENBAUGH, III,

Plaintiff-Appellant,

v

ENBRIDGE, INC., ENBRIDGE US, INC.,
ENBRIDGE PIPELINES, INC., ENBRIDGE
ENERGY PARTNERS, LP, ENBRIDGE
ENERGY LIMITED PARTNERSHIP,
ENBRIDGE ENERGY COMPANY, INC.,
ENBRIDGE HOLDINGS (TEXAS SYSTEMS)
LLC, and ENBRIDGE EMPLOYEE SERVICES,
INC.,

Defendants-Appellees,

and

STUART FLOYD COATES, JOHN RAYMOND
SOBOJINSKI, O'BRIENS RESPONSE
MANAGEMENT, INC., JOHN [NO LAST
NAME], SOSOT, LLC, also known as SPILL
OPERATIONS SPECIALIST OF TEXAS,
JASON BUFORD, TERRA CONTRACTING
SERVICES, LLC, TERRA CONTRACTING,
LLC, MANPOWER US, INC., and RICARDO
CEDILLO,

Defendants.

UNPUBLISHED
June 14, 2016

No. 325063
Calhoun Circuit Court
LC No. 2013-003248-CZ

Before: SERVITTO, P.J., and GADOLA and O'BRIEN, JJ.

PER CURIAM.

Plaintiff appeals as of right the trial court's order granting summary disposition in favor of the Enbridge entity defendants on plaintiff's claims of intentional interference with a business relationship and intentional infliction of emotional distress. We affirm.

-1-

# I. BACKGROUND

On July 26, 2010, defendant[1] reported that one of its oil pipelines had ruptured near Marshall, Michigan, and, according to plaintiff, about 819,000 gallons of oil was emitted into the Kalamazoo River. Defendant entered into various contracts for cleanup services, including a contract with SET Environmental, Inc., (SET) which hired plaintiff on August 29, 2010, as an at-will "normal clean-up worker." Plaintiff alleged that he was directed by defendant, SET, and other contractors to illegally hide and spread out the oil, as opposed to properly removing it. Plaintiff alleged that his objections to these practices were not resolved, so he videotaped the cleanup site and made reports to the Environmental Protection Agency (EPA) and state and local public bodies. Plaintiff alleged that he also reported this story to news media.

Shaun Dekker, a SET site supervisor, testified at deposition that he had approached plaintiff after hearing reports about him and told plaintiff not to take any more videos of the cleanup site. According to Dekker, the very next day, he was told that plaintiff was once again videotaping, so he brought it to the attention of Andy Saylor, SET Project Manager. A team meeting was held wherein Saylor and Dekker advised SET employees that the use of video on the jobsite was against company policy and would not be tolerated.

On October 14, 2010, plaintiff told Dave Murphy, a defendant site supervisor, about his reports to the media and the EPA. Murphy told Dekker that he "never wanted to see [plaintiff] around again." Murphy, however, testified at deposition that he never told anyone at SET, including Dekker, that he wanted plaintiff off the work site. Murphy stated that he never spoke with anyone within Enbridge or within SET about the conversation with plaintiff. Nevertheless, Dekker reported Murphy's alleged statement to Saylor, as well as an incident involving plaintiff and gasoline.

Jill Schoenman,[2] the head of SET's Human Resources Department, testified at deposition that on October 15, 2010, she received a phone call from Saylor concerning plaintiff. Schoenman directed Saylor to obtain Dekker's account of plaintiff's conduct. The account was recorded in a hand-written statement that noted plaintiff's videotaping as well as Murphy's alleged statement that he did not want plaintiff on the work sites any longer. Schoenman testified that after an initial conversation with plaintiff, wherein he admitted videotaping and providing video to the media and further stated that if he was terminated from SET he would sue them, she went to Michael O'Dwyer, her direct supervisor, and Dave DeVries, the president of SET, to discuss the situation. Schoenman stated that she, O'Dwyer, and Devries determined that plaintiff should be terminated because he violated the company's policy against videotaping

---

[1] The defendants participating in this appeal are various Enbridge entities, which we refer collectively to as "defendant."

[2] Schoenman's name is spelled inconsistently throughout the record.

work sites and reporting to the media.[3]  She phoned plaintiff on October 15, 2010, to inform him of their decision.

Schoenman stated that she never spoke to anyone employed by defendant during the termination process.  After plaintiff was terminated, she did see in Dekker's written statement that defendant, through Murphy, had indicated that it did not want plaintiff on the work sites, but she stated that she was only informed of that assertion after the decision to terminate plaintiff was made.  O'Dwyer testified that he never discussed plaintiff's termination with defendant and defendant never came up during the decision process.  DeVries testified that he did not speak to anyone employed by defendant about plaintiff's termination, and that before the termination DeVries had not heard from anyone that defendant did not want plaintiff on the work site.  Devries explained that while he was concerned about maintaining a relationship with defendant, SET does not ever want to be involved in the media, so the decision to terminate plaintiff had nothing to do with defendant and was completely related to SET's ability to control how it is represented.

Plaintiff also alleged that numerous incidents that occurred after his termination established a pattern of pervasive harassment by defendant and its purported agent-security guards that caused him severe emotional distress.  Plaintiff claimed that he was followed while investigating defendant's cleanup efforts, that defendant had plaintiff's photo widely disseminated among the security staff, that defendant's security barricaded plaintiff in a parking lot on private property that plaintiff was permitted to be on, that defendant's security staff called the police to report plaintiff as a trespasser when plaintiff was not trespassing, and that defendant's staff took down plaintiff's signs relating to the oil spill that were located on a public utility pole.  Plaintiff also alleged that he received death threats and had his motorcycle tampered with.

On October 11, 2013, plaintiff filed this lawsuit alleging claims of interference with contract or business relationship,[4] intentional infliction of emotional distress, false imprisonment, and malicious prosecution.  The trial court dismissed plaintiff's claims of false imprisonment and malicious prosecution on defendant's motion for summary disposition concerning the same.

Defendant filed several motions in limine to preclude the introduction of evidence at trial.  Of particular importance to this appeal, defendant requested the exclusion of evidence pertaining to the adequacy of defendant's remediation efforts, including whether defendant instructed workers to cover up oil.  The trial court concluded that evidence regarding remediation efforts would not be admissible during trial.  According to the trial court, *whether* defendant interfered with plaintiff's employment relationship was separate and distinct from showing *why* there

---

[3] Schoenman testified that the written company policies did not prohibit videotaping for an employee's personal use.  Rather, she explained, it is the company "practice" to not share customer information with the media.

[4] It was later clarified that plaintiff only sought a claim of intentional interference with a business relationship, as opposed to interference with a contract.

would have been such interference and the question was "simply was there the interference [by defendant] that resulted in the termination of [plaintiff] being employed or contracted to SET." The trial court's order subsequently stated that plaintiff's evidence would be limited to the specific actions that defendant allegedly took to interfere with plaintiff's employment and cause plaintiff emotional distress after he was terminated from SET. Thereafter, defendant filed a motion for summary disposition under MCR 2.116(C)(10). The trial court granted defendant's motion, dismissing the two remaining claims against defendant, and plaintiff appealed.[5]

## II. INTENTIONAL INTERFERENCE WITH A BUSINESS RELATIONSHIP

As to this claim, plaintiff primarily takes issue with the trial court's order precluding evidence of defendant's remediation efforts. However, plaintiff's argument also implicates whether, in light of that ruling, the trial court's subsequent grant of summary disposition under MCR 2.116(C)(10) in defendant's favor, dismissing plaintiff's claim of intentional interference with a business relationship, was proper. "A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion." *Barrett v Kirtland Community College*, 245 Mich App 306, 325; 628 NW2d 63 (2001). "An abuse of discretion occurs when the decision results in an outcome falling outside the principled range of outcomes." *Woodard v Custer*, 476 Mich 545, 557; 719 NW2d 842 (2006). This Court reviews de novo a trial court's ruling on a motion for summary disposition. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998).

A motion under MCR 2.116(C)(10) tests the factual support for a claim. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 474-475; 776 NW2d 398 (2009)*,* citing *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). The moving party has the burden to " 'specifically identify the issues as to which [it] believes there is no genuine issue as to any material fact . . . .' " and support its position with admissible documentary evidence. *Innovative Adult Foster Care, Inc*, 285 Mich App at 475, quoting MCR 2.116(G)(4) (alteration by *Innovative Adult Foster Care*), and citing MCR 2.116(G)(3)(b), MCR 2.116(G)(6), and *Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996). If the moving party meets its initial burden, "the burden shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial." *Innovative Adult Foster Care, Inc*, 285 Mich App at 475. " 'A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ.' " *Id.*, quoting *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). "In determining whether a genuine issue of material fact exists, the court must consider all documentary evidence

---

[5] Although we denied defendant's motion to strike plaintiff's brief on appeal (premised on nonconformance with MCR 7.212(C) and MCR 7.210(A)), defendant is correct that plaintiff's initial brief attempted to expand the record in this case. Plaintiff filed an amended brief that addressed some, but not all, of these errors. In deciding the issues raised on appeal, our review is appropriately limited to the evidence that was presented to the trial court at the time the motion was decided. *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App 466, 475-476; 776 NW2d 398 (2009).

in a light most favorable to the nonmoving party." *Innovative Adult Foster Care, Inc v Ragin*, 285 Mich App at 475.

The elements of tortious interference with a business relationship or expectancy are " 'the existence of a valid business relationship or expectancy, knowledge of the relationship or expectancy on the part of the defendant, an intentional interference by the defendant inducing or causing a breach or termination of the relationship or expectancy, and resultant damage to the plaintiff.' " *Dalley v Dykema Gossett*, 287 Mich App 296, 323; 788 NW2d 679 (2010), quoting *BPS Clinical Laboratories v Blue Cross & Blue Shield of Michigan (On Remand)*, 217 Mich App 687, 698-699; 552 NW2d 919 (1996). To fulfill the third element, which is at issue here, a plaintiff must demonstrate that the defendant acted both intentionally and either improperly or without justification. *Dalley*, 287 Mich App at 323-324. To show that the defendant acted improperly or without justification, the plaintiff "must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Feldman v Green*, 138 Mich App 360, 378; 360 NW2d 881 (1984). See also *Dally*, 287 Mich App at 324 (stating that "the plaintiffs must allege that the interferer did something illegal, unethical or fraudulent") (citation and internal quotation marks omitted). "To establish that a defendant's conduct lacked justification and showed malice, 'the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference.' " *Id*. at 324, quoting *BPS Clinical Laboratories*, 217 Mich App at 699. However, "where a defendant's actions were not per se wrongful and were motivated by legitimate personal and business reasons rather than by a desire to interfere with the plaintiff's contractual or business relationship, this Court has refused to impose liability." *Bonelli v Volkswagen of America, Inc.*, 166 Mich App 483, 499; 421 NW2d 213 (1988) (citation and internal quotation marks omitted).

Plaintiff asserts that defendant, through Murphy, interfered with his relationship with SET and that such interference was improper because Murphy should not have been able to tell SET that he wanted plaintiff off the work sites, i.e., that defendant wanted plaintiff to be fired. However, plaintiff's argument addressing the existence of an "improper motive" more practically relates to SET's motive in firing plaintiff; he is apparently attempting to show that Schoenman, O'Dwyer, and DeVries' articulated reasons for firing plaintiff were a pretext and that their actual reason was that Murphy induced them to fire plaintiff, given that SET wished to maintain an amicable working relationship with defendant. This argument sounds much more in causation on SET's part, rather than whether Murphy's conduct could amount to unjustified interference with plaintiff's employment.

In any event, the trial court grounded its decision to grant summary disposition in favor of defendant on the conclusion that plaintiff had failed to provide any evidence that "linked" Murphy's alleged statement to SET's decision to terminate plaintiff. A careful review of the deposition testimony presented in the trial court reveals that the trial court did not err in concluding that plaintiff failed to meet *his* burden to "establish the existence of a genuine issue of material fact for trial" on this issue. *Innovative Adult Foster Care*, 285 Mich App at 475.

Plaintiff's investigatory activities began well before he initiated contact with Murphy. According to Dekker, plaintiff began talking about lawsuits and had been videotaping for several weeks, which had led to a September 2010 meeting where Dekker and Saylor informed the staff

-5-

(including plaintiff) of the company's policy and practice against taking videos of work sites and reporting to the media. Yet plaintiff apparently persisted in his video activities.

According to Schoenman, the termination process was initiated by a phone call from Saylor, on October 15, 2010. This call did occur within days (if not a day) of plaintiff's conversation with Murphy and Murphy's alleged conversation with Dekker. However, Schoenman testified that she did not learn about Murphy's alleged statements until *after* plaintiff was terminated, and plaintiff has presented no evidence to the contrary. Also, although his memory was not certain, Saylor testified that he did not recall Dekker telling him about Murphy's desire to have plaintiff removed from the work sites. Furthermore, Schoenman testified that during her first phone call to plaintiff, plaintiff essentially attempted to blackmail her, stating that he would not go to the media as long as SET retained plaintiff. Schoenman, DeVries, and O'Dwyer unequivocally testified that their collective decision to terminate plaintiff had nothing to do with defendant, but rather, was based on plaintiff's decision to continue to violate SET's no-media policy and blackmail Schoenman in the process. In fact, each of the three witnesses involved in the decision-making process testified that he or she had no actual knowledge of Murphy's alleged statements that he did not want plaintiff working on the clean-up sites.

We acknowledge that Murphy's and Dekker's testimony conflicts regarding whether Murphy told Dekker that he did not want plaintiff working on the premises any longer. Assuming for the sake of argument that Murphy made the alleged statements to Dekker, plaintiff's claim still fails because he did not present sufficient evidence to establish a question of fact regarding the necessary causal connection between Murphy's alleged intentional interference with plaintiff's employment and plaintiff's actual termination. See *Alar v Mercy Mem Hosp*, 208 Mich App 518, 530; 529 NW2d 318 (1995) (stating that all tortious conduct must be the proximate cause of the plaintiff's loss in order to be actionable). The only inference that plaintiff presented to show that Murphy's alleged intentional interference with plaintiff's employment caused his termination related to the close timing of when Murphy would have told Dekker that he wanted plaintiff off of the work sites and SET's decision to terminate plaintiff. However, it has been repeatedly stated in the context of employment retaliation and discrimination cases that a " 'temporal relationship, standing alone, does not demonstrate a causal connection between [a] protected activity and any adverse employment action. Something more . . . is required to show causation.' " *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 384; 689 NW2d 145 (2004), quoting *West*, 469 Mich at 186. We see no reason to adopt any different or more lenient standard in intentional interference cases. Plaintiff's claim that those who decided to terminate plaintiff from SET based their decision on a directive from defendant is speculative at best, and mere conjecture and speculation do not establish a genuine issue of material fact sufficient to survive a motion for summary disposition. *Karbel v Comerica Bank*, 247 Mich App 90, 97-98; 635 NW2d 69 (2001).

Plaintiff also argues that the circumstances surrounding defendant's remediation of the oil spill and whether a wide-scale cover up actually occurred was relevant to his intentional interference claim, and that the trial court abused its discretion in limiting discovery regarding this subject and in holding that such evidence would be inadmissible at trial. We disagree.

Plaintiff appears to reason that if he was telling the truth when he was attempting to expose defendant and SET, Murphy would be more likely to want plaintiff fired, which would increase the probability that he did indeed make the alleged statements to Dekker, and it would be more likely that SET listened to Murphy's directive to fire plaintiff, which would strengthen the causal connection between Murphy's conduct and plaintiff's termination. The fatal flaw in this reasoning is that, as explained, there is simply no credible evidence that establishes that those who fired plaintiff did so with any actual knowledge of Murphy's alleged statements about plaintiff. Thus, it does not matter whether Murphy was telling the truth in denying that he made the statements, and the veracity of plaintiff's allegations of a cover up does not demonstrate that the decision-makers at SET were more likely to fire plaintiff at Murphy's request.

Moreover, despite any potential relevancy of evidence that corroborates plaintiff's allegations of the environmental cover up, the trial court aptly concluded that the adequacy of defendant's efforts in remediating the effects of the oil spill should be excluded under MRE 403 as misleading and confusing to the jury. See *McDonald v Stroh Brewery Co*, 191 Mich App 601, 605; 478 NW2d 669 (1991), citing MRE 403. Plaintiff's deposition testimony demonstrated his intent to use this case as a vehicle to expose defendant, and his testimony and discovery requests indicated that the trial on his claim of intentional interference of a business relationship could morph into a separate trial on the circumstances of the oil spill and the intricacies of necessary remediation efforts. Importantly, the trial court did not preclude evidence regarding why plaintiff believes he was terminated. The trial court's intent was to avoid a lengthy, complex mini-trial on the issue of whether defendant, SET, and even the EPA were diligent in remedying the oil spill. See *Rock v Crocker*, 308 Mich App 155, 174; 863 NW2d 361 (2014). Viewed in context, the trial court did not abuse its discretion in excluding the evidence relating to the adequacy of defendant's remediation efforts.

Plaintiff also asserts that summary disposition was inappropriate because there remains a question of the credibility of witnesses for the jury's consideration. Plaintiff argues that Dekker's and Murphy's testimony conflicts and thus it is appropriate for a jury to decide who is being truthful. See *Lysogorski v Bridgeport Charter Twp*, 256 Mich App 297, 299; 662 NW2d 108 (2003) (stating that "a court may not weigh the evidence before it or make findings of fact; *if the evidence before it is conflicting*, summary disposition is improper") (citation and internal quotation marks omitted; emphasis by *Lysogorski*). It is axiomatic that a trial court may not make credibility determinations in deciding whether there exists a genuine issue of material fact for the purposes of a motion for summary disposition under MCR 2.116(C)(10). See *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994). However, the trial court did not make credibility determinations regarding the conflicting testimony of Dekker and Murphy because it too assumed for the sake of argument that Murphy made the alleged statements to Dekker and nonetheless properly concluded that plaintiff had failed to establish that Murphy's alleged statements caused Schoenman, DeVries, and O'Dwyer to terminate plaintiff from SET.

In that regard, plaintiff also argues that summary disposition was inappropriate because a jury could disbelieve Schoenman's, DeVries', and O'Dwyer's testimony that they had no knowledge of Murphy's directive to fire plaintiff before they decided to terminate plaintiff. But once defendant demonstrated to the trial court that plaintiff's evidence was insufficient to establish an essential element of plaintiff's claim, i.e., causation, it was incumbent upon plaintiff "to establish that a genuine issue of disputed fact exists" without merely relying on allegations.

-7-

*Quinto*, 451 Mich at 362 (citations omitted). Plaintiff has provided no affirmative evidence that Schoenman, DeVries, and O'Dwyer *were* aware of Murphy's alleged statements, or perhaps more importantly, that they based their decision to terminate plaintiff on those alleged statements. As explained, plaintiff has demonstrated nothing beyond a temporal relationship between when Murphy's statements would have been made to Dekker and Schoenman, DeVries, and O'Dwyer's decision to terminate plaintiff. Accordingly, summary disposition in favor of defendant was proper because plaintiff failed to present any evidence beyond his own allegations and speculative inferences that Murphy's alleged conduct had any impact on SET's decision to terminate him. See *Quinto*, 451 Mich at 371; *Karbel*, 247 Mich App at 97-98.

## III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff next argues that the trial court erred in granting summary disposition to defendant on his claim of intentional infliction of emotional distress.[6] We disagree.

To sustain a claim of intentional infliction of emotional distress, a plaintiff must show "(1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress." *Doe v Mills*, 212 Mich App 73, 91; 536 NW2d 824 (1995). *Doe* further stated:

> Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. [*Linebaugh v Sheraton Michigan Corp*, 198 Mich App 335, 342; 497 NW2d 585 (1993)]. Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. *Id*. It has been said that the case is generally one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!" *Roberts v Auto-Owners Ins Co*, 422 Mich 594, 603; 374 NW2d 905 (1985). [*Id*. (alteration added).]

A court determines "whether the defendant's conduct reasonably may be regarded as so extreme and outrageous as to permit recovery." *Id.* at 92. "However, '[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.' " *Id*., quoting 1 Restatement Torts, 2d, § 46, comment h, p 77 (alteration by *Doe*).

Setting aside the fact that there does not appear to be evidence of plaintiff's severe emotional distress, the trial court correctly concluded that the incidents plaintiff relies on to

---

[6] Plaintiff's discussion of this issue on appeal involves a substantial amount of evidence that was not presented to the trial court. Thus, we reiterate that our review and analysis of this issue relates to whether the trial court erred in granting summary disposition to defendant based on the evidence and arguments that were considered by the trial court.

support his claim do not rise to the level of extreme and outrageous conduct. Regarding the alleged assault he endured at a casino, it is unclear who committed the alleged assault and how that person is connected to defendant. Plaintiff admitted that he does not have evidence of death threats, which he attributes to the phone company's failure to provide him with a record of text messages, nor does he have evidence of who tampered with his motorcycle. Plaintiff did support his claim that one of plaintiff's signs was removed with eye-witness testimony, but the removal of a sign on a public utility pole is without question outside the bounds of extreme and outrageous conduct for the purposes of his claim of intentional infliction of emotional distress.

The remaining allegations pertain to defendant's reaction to plaintiff's presence on or near the work sites while plaintiff conducted his investigations. John Sobojinski, defendant's Chief Operating Officer, testified that after plaintiff consistently trespassed and interfered with the cleanup effort, he was instructed to call the police if plaintiff returned to avoid placing plaintiff and others in danger on defendant's property. Further, if plaintiff was on public property, the instructions were to not interfere with plaintiff. Sobojinski testified that the police were not called merely because plaintiff was videotaping defendant's work, and he noted that several others, members of the media, for example, would do the same, but from a safe location without interfering with the work. Plaintiff is in apparent agreement that his activities exceeded those of others that would have been reporting matters relating to the oil spill, and regardless whether plaintiff was actually trespassing or was on private property near the work site, there is nothing that "atrocious and utterly intolerable in a civilized community" about defendant's policy to seek intervention of law enforcement should plaintiff's actions become too intrusive. *Doe*, 212 Mich App at 91. Indeed, this Court has concluded that a claim of emotional distress could not be sustained where the defendant's "employee did no more than file a complaint with law enforcement officials." *Hall v Pizza Hut of America, Inc*, 153 Mich App 609, 617; 396 NW2d 809 (1986).

Plaintiff's allegations that defendant's security guards were following him on public roads was corroborated by Tyler Phares' testimony, and the testimony of Garrett Murray, a security officer. The testimony supports the general notion that, in Murray's belief, the security guards, and defendant or its subcontractors treated plaintiff poorly. However, Phares was unable to testify with any certainty as to who the men following them were, and Ricardo Cedillo, defendant's security supervisor, testified that he was never *asked* to follow plaintiff in his vehicle. Nevertheless, it appears that on at least one occasion, defendant's efforts in keeping an eye on plaintiff's activities near the work sites led security guards onto privately owned property where plaintiff was parked.[7] Plaintiff's claim that he suffered severe emotional distress from this instance is entirely belied by plaintiff's conduct evidenced in a video recording of this incident viewed by the trial court, and Cedillo testified that as soon as the property owner asked them to leave, they did. Furthermore, the trial court correctly concluded that there was an exit available to plaintiff if he had been inclined to remove himself from this situation. Perhaps reasonable minds could disagree regarding who was to blame for the apparent increased tension between

---

[7] This particular instance served as the basis for plaintiff's claim of false imprisonment, and defendant correctly notes that plaintiff did not appeal the trial court's dismissal of that claim.

defendant's security and plaintiff, but presuming that plaintiff's behavior was entirely innocent, at most the alleged actions of the security guards amount to "mere insults, indignities, threats, annoyances, [or] petty oppressions," which do not support a claim of intentional infliction of emotional distress. *Doe*, 212 Mich App at 91.

We hold that the trial court did not err in granting summary disposition to defendant under MCR 2.116(C)(10) because (1) plaintiff failed to establish a genuine issue of material fact regarding whether SET's decision to termination him was based on a statement allegedly made by defendant's employee to an SET employee, and (2) plaintiff's evidence and allegations presented in the trial court do not support the conclusion that reasonable minds could differ as to whether conduct attributable to defendant was extreme and outrageous for the purpose of his claim of intentional infliction of emotional distress.

Affirmed.


/s/ Deborah A. Servitto
/s/ Michael F. Gadola
/s/ Colleen A. O'Brien

-10-