KARBEL v COMERICA BANK

Docket No. 216324. Submitted February 7, 2001, at Detroit. Decided July 31, 2001, at 9:00 A.M. Leave to appeal sought.

Robert A. Karbel, as personal representative of the estates of George F. and Lynne S. Drummey, brought an action in the Wayne Circuit Court against Comerica Bank and Marietta Frankel, as co-personal representatives of the estate of Charles A. Muer, and C.A. Muer Corporation, seeking damages for the alleged wrongful deaths of the Drummeys while on a voyage from the Bahamas to Florida on a sailboat owned by C.A. Muer Corporation, sailed by Charles Muer, and judicially determined to have been lost at sea along with its occupants. The defendants moved for summary disposition of the plaintiff's alternative claims under general maritime law, which permits a suit for damages for death occurring one marine league, or three nautical miles, from shore, and the Death on the High Seas Act (DOHSA), 46 USC 761 *et seq.*, which permits a suit for damages only for pecuniary loss for death occurring more than one marine league from shore. The defendants contended that there were no genuine issues of material fact and they were entitled to judgment as a matter of law in view of deposition testimony by the plaintiff's expert witness indicating that the sailboat, which was never found, sank more than one marine league from the Florida coast and in view of the absence of any claim of damages for pecuniary loss. The defendants further argued that the plaintiff's expert's subsequent affidavits recanting his deposition testimony could not be used by the plaintiff to disavow the expert's previous sworn statements and that, in any event, the information contained in the affidavits was based on conjecture and speculation. The court, Marianne O. Battani, J., granted the defendants' motion. The plaintiff appealed.

The Court of Appeals *held*:

The plaintiff had to establish that the sailboat sank within one marine league of the Florida coast in order to maintain the action under general maritime law. The trial court did not err in granting summary disposition for the defendants because the affidavits of the plaintiff's expert were insufficient to raise a genuine issue of fact concerning the location of the sinking. The plaintiff's expert's

opinion in his affidavits that the sailboat sank within one marine league of the Florida coast rested on a series of speculative calculations, given that the sailboat was never found and given uncertainty concerning what sails were deployed, the effect of changing winds, sea conditions, and the gulf stream had on sailing speed, and the unknowable course taken by the sailboat.

Affirmed.

MOTIONS AND ORDERS — SUMMARY DISPOSITION — GENUINE ISSUES OF MATERIAL FACT.

A party presenting a motion for summary disposition based on the absence of a genuine issue of material fact and entitlement to judgment as a matter of law has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence; the burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists; where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth the specific facts showing that a genuine issue of material fact exists; if the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted (MCR 2.116[C][10], [G][4]).

*Seikaly & Stewart, P.C.* (by *Jeffrey T. Stewart*), for the plaintiff.

*Willingham & Coté, P.C.* (by *John L. Coté* and *Curtis R. Hadley*) and *Leonard, Kruse & Zlatopolsky* (by *Norbert B. Leonard*), for the defendants.

Before: BANDSTRA, C.J., and GRIFFIN and COLLINS, JJ.

GRIFFIN, J. This action arises from the March 13, 1993, sinking of *Charley's Crab*, a forty-foot sailboat owned by C.A. Muer Corporation and operated presumably by defendants' decedent, Charles A. Muer, that resulted in the deaths of all aboard, including George F. Drummey and Lynne S. Drummey, plaintiff's decedents. Plaintiff Robert A. Karbel, as personal representative of the estates of the Drummeys, com-

menced a wrongful death action against defendants.[1] Plaintiff appeals as of right an order of the trial court granting summary disposition in favor of defendants. We affirm.

I

In the early part of March 1993, plaintiff's decedents were vacationing with Charles Muer and his wife on the sailboat *Charley's Crab*. The two couples had been sailing in the waters surrounding the Bahama Islands and intended to sail to Jupiter, Florida. On March 10 and 11, 1993, the National Weather Service of the United States issued severe weather watches and warnings for the area of the sailboat's expected course. A storm hit the coast of Florida on March 13, 1993, resulting in high winds and heavy seas. The sailboat was reported as overdue on March 15, 1993, and a search was conducted, but no evidence of the sailboat or its occupants was found. It was judicially determined that the sailboat and its occupants were lost at sea on March 13, 1993, off the coast of Florida.

On December 12, 1994, plaintiff commenced a wrongful death action against defendants, alleging that Muer owed plaintiff's decedents a duty to exer-

---

[1] Plaintiff's complaint originally named as defendants Charles A. Muer and the C.A. Muer Corporation. Plaintiff and the C.A. Muer Corporation subsequently entered into a settlement agreement and the C.A. Muer Corporation was dismissed from the litigation. After the filing of plaintiff's appeal in this Court, plaintiff, pursuant to stipulation of the parties, filed a motion to amend the case caption to reflect the appointment of Comerica Bank and Marietta Frankel as co-personal representatives of the estate of Charles Muer. By order of this Court dated July 11, 2001, the caption has been so amended and this opinion therefore refers to defendants in plural form.

cise the care of a reasonably prudent mariner. Plaintiff claimed that Muer should have known the approaching storm presented an unreasonable risk of harm to plaintiff's decedents and that Muer was negligent for failing to seek safe harbor and in proceeding to Jupiter, Florida. Plaintiff contended the cause of action was governed by general maritime law or, alternatively, the Death on the High Seas Act (DOHSA), 46 USC 761 *et seq.*, which permits suits for damages resulting from death that occurs more than one marine league (equivalent to three nautical miles) from shore as a result of wrongful act, neglect, or default.[2]

Following the commencement of certain proceedings in the federal district court by the estate of Charles A. Muer and the ultimate resolution of the matter by the Sixth Circuit Court of Appeals,[3] during which time the state court proceedings were stayed, the case was returned to the Wayne Circuit Court. Defendants then moved for summary disposition, contending that the pivotal issue in the case was whether general maritime law or the DOHSA applied. Defendants argued that one of the essential elements of plaintiff's claims under general maritime law was that plaintiff's decedents' deaths occurred within one marine league from shore, which plaintiff had the burden of proving by a preponderance of the evidence. Defendants claimed that plaintiff could not meet this alleged burden because plaintiff's expert had definitively testified at his deposition that the sailboat sank

---

[2] The DOHSA specifically limits recovery for wrongful death to "pecuniary loss." Plaintiff concedes that his claims at issue do not involve pecuniary damages.

[3] See *In re Muer*, 146 F3d 410 (CA 6, 1998).

more than one marine league from shore. Defendants further argued that plaintiff's expert's subsequent affidavits recanting his deposition testimony could not be used by plaintiff to disavow the expert's previous sworn statements and that, in any event, the information contained in these affidavits was based on conjecture and speculation. Defendants maintained the evidence showed that the sailboat sank more than one marine league from shore and, therefore, the DOHSA provided the exclusive remedy for plaintiff's decedents' deaths; consequently, plaintiff's claims under general maritime law should be dismissed because plaintiff did not meet his burden of proof and plaintiff's claim for noneconomic damages should be dismissed because the DOHSA precluded the recovery of such damages.

The trial court essentially agreed with defendants' arguments and, concluding that the DOHSA applied under the circumstances, granted defendants' motion for summary disposition. Plaintiff now appeals.

II

As a preliminary matter, we reject plaintiff's contention that the trial court erred in ruling that plaintiff had the burden of proving that the sinking occurred within three miles of shore. Plaintiff filed a three-count complaint that alleged, in part, that decedents' deaths occurred within one marine league from shore, thereby entitling plaintiff to bring a wrongful death action under general maritime law. "Each party has the burden to prove its own cause of action." *League General Ins Co v Catastrophic Claims Ass'n*, 165 Mich App 278, 293; 418 NW2d 708 (1987 rev'd on other grounds 435 Mich 338; 458 NW2d 632 (1990).

Moreover, the DOHSA does not change the burden of proof with regard to tort claims. *In re Marine Sulphur Queen*, 460 F2d 89, 101, n 2 (CA 2, 1972). Because plaintiff's cause of action was based in part on an allegation that the deaths occurred within three miles of shore, we conclude that the trial court did not err in determining that plaintiff had the burden of establishing that allegation.

Plaintiff's related argument that a wrongful death action under general maritime law is not limited to coastal waters and defendants therefore had the burden of establishing the applicability of the DOHSA is likewise meritless. See *Moragne v States Marine Lines, Inc*, 398 US 375; 90 S Ct 1772; 26 L Ed 2d 339 (1970). Cf. *Miles v Apex Marine Corp*, 498 US 19; 111 S Ct 317; 112 L Ed 2d 275 (1990); *Offshore Logistics, Inc v Tallentire*, 477 US 207; 106 S Ct 2485; 91 L Ed 2d 174 (1986) (the DOHSA cannot be supplemented with state law remedies); *Mobil Oil Corp v Higginbotham*, 436 US 618, 625; 98 S Ct 2010; 56 L Ed 2d 581 (1978).

III

The essence of plaintiff's appeal is his contention that the trial court erred in concluding there was no genuine issue of material fact regarding the location of the sailboat when it sank. We disagree.

On appeal, this Court reviews de novo a trial court's decision regarding a summary disposition motion. *Henderson v State Farm Fire & Casualty Co*, 460 Mich 348, 353; 596 NW2d 190 (1999). "A motion for summary disposition under MCR 2.116(C)(10)

tests whether there is factual support for a claim."[4] *Libralter Plastics, Inc v Chubb Group of Ins Cos,* 199 Mich App 482, 485; 502 NW2d 742 (1993). The standard to be used in reviewing such a motion is set forth in *Quinto v Cross & Peters Co,* 451 Mich 358, 361-363; 547 NW2d 314 (1996):

> MCR 2.116 is modeled in part on Rule 56(e) of the Federal Rules of Civil Procedure. As pointed out by Justice Brennan in *Celotex v Catrett,* 477 US 317; 106 S Ct 2548; 91 L Ed 2d 265 (1986),the initial burden of production is on the moving party, and the moving party may satisfy the burden in one of two ways.
>
> "First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, *the moving party may demonstrate to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.* If the nonmoving party cannot muster sufficient evidence to make out its claim, a trial would be useless and the moving party is entitled to summary judgment as a matter of law. [477 US 331 (citations omitted).]"
>
> In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), a trial court considers affidavits, pleadings, depositions, admissions, and documentary evi-

---

[4] Defendants' motion for summary disposition did not expressly set forth the subpart under which the motion was brought; however, the sole argument presented in support of the motion was that "there was no genuine issue of material fact that the vessel sank beyond a marine league from shore, and therefore, the general maritime law does not apply, and the sole remedy is DOHSA." While rendering its decision on defendants' motion, the trial court erroneously stated that defendant's motion was brought pursuant to MCR 2.116(C)(7). "Nonetheless, if summary disposition is granted under one subpart of the court rule when it was actually appropriate under another, the defect is not fatal and does not preclude appellate review as long as the record permits review under the correct subpart." *Michigan Basic Property Ins Ass'n v Detroit Edison Co,* 240 Mich App 524, 529; 618 NW2d 32 (2000). For the reasons stated below, we conclude that summary disposition was appropriate under MCR 2.116(C)(10).

dence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the affidavits or other documentary evidence show that there is no genuine issue in respect to any material fact, and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), (G)(4).

In presenting a motion for summary disposition, the moving party has the initial burden of supporting its position by affidavits, depositions, admissions, or other documentary evidence. *Newbacher v Globe Furniture Rentals*, 205 Mich App 418, 420; 522 NW2d 335 (1994). The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. *Id. Where the burden of proof at trial on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. McCart v J Walter Thompson [USA, Inc]*, 437 Mich 109, 115; 469 NW2d 284 (1991). If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. *McCormic v Auto Club Ins Ass'n*, 202 Mich App 233, 237; 507 NW2d 741 (1993). [Emphasis added.]

See also *Maiden v Rozwood*, 461 Mich 109, 119-121; 597 NW2d 817 (1999); *Smith v Globe Life Ins Co*, 460 Mich 446, 454-455; 597 NW2d 28 (1999).

"Circumstantial evidence may be sufficient to establish a case." *Libralter, supra* at 486. Nonetheless,

parties opposing a motion for summary disposition must present more than conjecture and speculation to meet their burden of providing evidentiary proof establishing a genuine issue of material fact. . . . A conjecture is simply an explanation consistent with known facts or conditions, but

not deducible from them as a reasonable inference. [*Id.* (citations omitted).]

See also *McCune v Meijer, Inc,* 156 Mich App 561, 563; 402 NW2d 6 (1986).

The observations of our Supreme Court in *Skinner v Square D Co,* 445 Mich 153, 164-165; 516 NW2d 475 (1994), quoting *Kaminski v Grand Trunk W R Co,* 347 Mich 417, 422; 79 NW2d 899 (1956), regarding the basic legal distinction between a reasonable inference and impermissible conjecture, albeit made in the context of determining the requisite causal proof in negligence cases, are nonetheless relevant to the present case:

> "[A] conjecture is simply an explanation consistent with known facts or conditions, but not deducible from them as a reasonable inference. *There may be 2 or more plausible explanations as to how an event happened or what produced it; yet, if the evidence is without selective application to any 1 of them, they remain conjectures only.* On the other hand, if there is evidence which points to any 1 theory of causation, indicating a logical sequence of cause and effect, then there is a juridical basis for such a determination, notwithstanding the existence of other plausible theories with or without support in the evidence." [Emphasis added.]

The crucial factor is that " 'if [the] evidence lends equal support to inconsistent conclusions or is equally consistent with contradictory hypotheses, negligence is not established.' " *Skinner, supra* at 166-167, quoting 57A Am Jur 2d, Negligence, § 461, p 442. In other words, " '*[w]e cannot permit the jury to guess.*' " *Skinner, supra* at 166, quoting *Daigneau v Young,* 349 Mich 632, 636; 85 NW2d 88 (1957) (emphasis added).

In the instant case, the parties sharply dispute where the vessel sank. There is no direct evidence of exactly where the vessel went down, and no wreckage has ever been found. On the morning of March 12, 1993, the sailboat was sighted heading toward Florida by a charter boat captain on a fishing trip in the Bahamas at the time. The vessel was again sighted and photographed at approximately 2:45 P.M. that same day by a Coast Guard surveillance plane. The aerial photograph shows that *Charley's Crab* was flying one sail, a spinnaker at that time, and was traveling at a heading of 340 degrees. According to plaintiff's expert, James Allen, the Coast Guard report referencing this sighting depicted the speed of the vessel at seven knots; however, Allen's own estimation of the speed of the vessel, based on his review of the photograph, was five or six knots. Allen calculated the vessel to be ninety-five to one hundred miles from the Florida coast. The sailboat was not seen again. An emergency cellular telephone call was placed at 4:30 A.M. on March 13, 1993, from a telephone known to be on the vessel. The call was received at Lantana, Florida, a site not far from Muer's intended destination, but the call disconnected almost immediately. Plaintiff concedes that because the range of cellular telephones varies and is not capable of precise measurement, the telephone call is "insufficient by itself to establish that the vessel was within three miles of shore."

The only other evidence offered with regard to the possible location of the boat was the opinion testimony of plaintiff's expert, James Allen, a retired Coast Guard officer with over thirty years' experience

in search and rescue operations.[5] Allen was deposed in connection with the federal complaint. During the deposition, he opined that the sailboat was more than one marine league from shore when it sank. Allen testified that the most important single variable in determining how close the vessel may have come to the Florida coast was the average speed the vessel could have maintained during its voyage. This required, in part, an estimation of the "hull speed" of the sailboat, which Allen obtained by contacting the manufacturer of the vessel. Allen testified he was told by the manufacturer that the "hull speed" would be "approximately 8 knots and the maximum actual sustained speed would probably be closer to 7 knots." Allen based his calculations of speed and distance traveled on the assumption that the vessel would probably average approximately two knots an hour less than its hull speed potential.

However, after Allen's deposition, another witness, Daniel Mercier, was deposed. Mercier had sailed with Mr. Muer and Mr. Drummey on the trip over to the Bahamas, one week before the disappearance of *Charley's Crab*.[6] Thus, Mercier was the last person, other than the decedents, to travel on *Charley's Crab*. On the basis of his direct observation of the speed indicator on the sailboat, Mercier testified the boat occasionally reached speeds in excess of eleven knots and for an extended time averaged ten knots in what he termed as ideal sailing conditions and favorable winds.

---

[5] During a significant portion of Allen's career, his territory included the same waters off the Florida coast involved in this case.

[6] Mrs. Muer and Mrs. Drummey flew to the Bahamas and joined their husbands there.

Purportedly on the basis of Mercier's testimony, characterized by plaintiff as newly discovered evidence, Allen revised his original projections of the sailboat's location and, in an affidavit dated June 5, 1996, stated that if the information provided by Mercier regarding speeds averaging ten knots was true, then the sailboat was able to maintain speeds of 1 to 1.25 knots higher than originally estimated and *could have* been within one marine league of shore. This conclusion was supported by Allen's assertion that Muer would have had an incentive to get close to shore as quickly as possible if the weather was deteriorating, and the fact that because the winds did not shift until the storm front moved rapidly from land out over water, "it is highly possible that the vessel could have made it to within three [nautical] miles of shore before encountering winds coming in the opposite direction and blowing the vessel back out to sea." Allen averred in his affidavit that before learning of Mercier's testimony, he did not know that the vessel was capable of moving through the water at a speed of ten knots and had instead assumed on the basis of a conversation with the manufacturer that the maximum speed through the water was only seven or eight knots.

In a second affidavit filed with plaintiff's response to defendants' motion for summary disposition on June 26, 1996, Allen set forth "additional calculations in an effort to determine with greater precision the speed that *Charley's Crab* would have had to maintain beginning at various points along its route in order to be within three miles of the Florida coast at 4:30 A.M., the time when the storm is presumed to

have overcome the vessel." His calculations stated in pertinent part:

3. The variables which determine the vessel's speed through the water, assuming it is being sailed efficiently, are its hull design, the sails it has deployed at any given moment, the direction of the wind and the strength of the wind.

4. At all times prior to the moment that the storm hit, the available weather information concerning wind direction and velocity suggests that the winds were favorable for sailing. They were out of the south and/or southeast for most of the voyage. This would place the winds at or toward the stern of the vessel and generally pushing it in the direction that the vessel was "trying to go" during virtually all of the voyage.

5. The vessel's speed toward its destination would be determined by its speed through the water and the currents which it would encounter en route. On the trip from the Bahamas to Florida the only currents of significance would be those encountered in the Gulf Stream. Those currents, assuming that the course was set appropriately to take advantage of them, would have tended to increase the speed toward destination rather than decrease it since the vessel needed to move from a southerly to northerly direction and the Gulf Stream moves generally in that way.

6. From the time that the vessel was sighted and photographed at approximately 2:45 P.M. on March 12, 1993, through 4:30 A.M. on March 13, 1993, its average speed toward its destination would have had to be 7.78 knots in order to be within three miles of the Florida Coast as of 4:30 A.M. on March 13, 1993.

7. The weather broadcasts available from the Coast of Florida began as of 4:30 P.M. on March 12, 1993 to warn of gale force winds and generally much worse conditions than were predicted in the forecasts being made from 10:30 A.M. up to 4:30 P.M. If Mr. Muer heard the weather forecast as of 4:30 P.M. and determined to proceed to Florida in the face of an approaching storm, it is reasonable to assume that he

would have sailed the vessel so as to make maximum speed in order to arrive ahead of the storm if at all possible.

8. Even if the vessel maintained an average speed of only 6 to 6½ knots until approximately 5:00 P.M. on the evening of March 12, 1993, an average speed of 8.13 knots toward its destination from that point forward would have been sufficient to bring the vessel within three miles of the Florida Coast by 4:30 A.M. on March 13, 1993.

\*     \*     \*

11. Taking into account the benefit provided by the Gulf Stream, the average speed which the vessel would have had to maintain on an average between the sighting at 2:45 P.M. on March 12, 1993, and a point within three miles of the Florida shore, is 7.03 knots. The average speed which it would have had to maintain beginning at 6:00 P.M. on March 12, 1993 to get within three miles of the Florida Coast by 4:30 A.M. on March 13, 1993 would be 7.27 knots.

Plaintiff argues that Allen's modified conclusion contained in his affidavits—that

if testimony from an eyewitness observing the vessel to be traveling at an average speed of 10 knots under favorable sailing conditions and sometimes over 11 knots is taken as true, then it would be my opinion that the vessel could easily have made it to within three miles of shore at the time of its loss—raises a genuine issue of material fact regarding where the accident occurred and thus whether the DOHSA applies to the present circumstances.

However, even assuming arguendo the propriety of plaintiff's submission of Allen's affidavits in support of his response to the summary disposition motion, see, generally, *Palazzola v Karmazin Products Corp*, 223 Mich App 141, 155; 565 NW2d 868 (1997), we conclude that plaintiff's proffered evidence, viewed in the light most favorable to plaintiff, still does not raise a

genuine issue of material fact sufficient to withstand summary disposition.

Although Allen concluded that the sailboat *could have been* within three miles of shore because it was capable of greater speeds than originally thought, his opinion is based on impermissible conjecture, not reasonable inferences. *Skinner, supra; Libralter, supra.* Allen's revised projections of the sailboat's location were based on a speed that was attained under conditions that apparently did not exist on the day preceding the sinking. Mercier testified that during his voyage on *Charley's Crab* the sailboat had consistently traveled at a speed of approximately ten knots. However, this speed was achieved when the "highest expected sails were up," the wind was extremely favorable, and the seas were relatively calm. By contrast, weather conditions on the return trip were far from the ideal conditions experienced by Mercier and, although the Coast Guard photograph shows the spinnaker sail in use at 2:45 P.M. on March 12, 1993, there is simply no evidence regarding the type or number of sails that were used thereafter on the remainder of the doomed voyage.

Moreover, there are no known facts that give rise to a reasonable inference that the vessel's speed was increased to the levels projected by Allen. When the sailboat was sighted by the Coast Guard at 2:45 P.M. on March 12, 1993, the weather conditions were good and the sailboat was traveling, according to Allen's estimation, at a speed of five or six knots (seven knots by Coast Guard estimation). In his second affidavit, Allen calculated that the sailboat had to average a speed of at least 7.78 knots from the time of its last known sighting (7.03 knots assuming the benefit

of the gulf stream) in order to be within three miles of shore; however, the likelihood of this occurring was undermined by Allen's own deposition testimony. The evidence indicates that the weather was favorable until 6 P.M. on Friday, March 12, approximately nine hours after *Charley's Crab* left Chub Key for the coast of Florida and ten and one-half hours before the estimated time of the sinking of the vessel at 4:30 A.M. on March 13. Allen opined that from 6:00 P.M. on March 12 until the vessel sank, wind and sea conditions progressively worsened. On the basis of a projection of the sailboat's position at a speed of six knots, Allen estimated that by 10:00 P.M., the winds were gusting up to twenty miles an hour and seas had risen to three to five feet. At 11:00 P.M., seas became "sloppy"—five to eight feet and getting higher. By midnight, the waves would have been in excess of eight feet, pitching the sailboat from side to side and slowing its forward movement, and by 1:00 A.M., Allen testified, the seas would have reached ten to fifteen feet. Allen estimated that the squall line, producing winds in excess of fifty-five miles an hour, passed at approximately the time the sailboat sank. Thus, according to Allen, for at least 6½ hours before the estimated time of sinking, *Charley's Crab* was encountering deteriorating sea and weather conditions. Allen acknowledged that the speed of a vessel is directly related to wind and sea conditions it encounters:

> Q. [*Defense Counsel*] Well, a vessel is capable of sailing in a reasonably straight line, is it not?
> A. [*James Allen*] It is, but it's not that straight, and especially when you get sloppy seas and it's going to be bouncing around.

> *Q.* Sloppy, would you agree that what you call sloppy seas, another definition might be rough seas.
>
> *A.* Say over eight feet you are going to start to see the waves pitch you from side to side.
>
> *Q.* Would you agree those kinds of seas would tend to slow the forward movement of a vessel?
>
> *A.* Somewhat, depending on the vessel.
>
> *Q.* You wouldn't expect to make as good a time in those kinds of seas than if the seas are relatively flat?
>
> *A.* No.

Allen further testified as follows:

> *Q.* [*Defense Counsel*] Would you also agree that if sea conditions were rough seas that a boat such as this Freedom 40 would not be able to make maximum speed because it would be slowed by rough seas?
>
> *A.* [*James Allen*] It's possible, yeah.

Moreover, although Allen surmised in his affidavits that the sailboat's speed was increased upon learning of the deteriorating weather conditions, Allen in fact did not know whether the weather information was heard by the occupants of the sailboat. It is equally possible that the occupants of the sailboat did not realize the potential danger posed by the weather and maintained a speed of six knots. In any event, logic would dictate, as Allen acknowledged, that even assuming the winds were for some period pushing the boat toward its destination, increasingly adverse sea conditions during the evening and early morning hours of March 12-13 would have eventually slowed the vessel down, not speeded it up. Considering the last known location of the vessel in relation to the approach of the storm front, the sailboat had approximately eighty to eighty-five miles to travel through rough seas.

In sum, nearly all the variables acknowledged by Allen to be critical to an accurate analysis of speed are subject to mere speculation. The fate of *Charley's Crab* is truly a mystery. It is simply impossible to ascertain with any reasonable degree of certainty what sails would have been deployed at any given time, or the effect that changing winds (velocity, shift, and direction), the condition of the seas, and the gulf stream would have had on the speed of the vessel at given increments of time, particularly since the ultimate course of *Charley's Crab* is unknown. Allen's opinion rests on a series of speculative calculations; his hypothesis that *Charley's Crab could have* made it to territorial waters before it disappeared "is, at best, just as possible as another theory," *Skinner, supra* at 164, and does not afford a reasonable factual basis for the conclusion that "more likely than not" his analysis is correct. *Id.* at 165. Consequently, plaintiff's proffered evidence constitutes only a "mere possibility," which is insufficient to raise a material question of fact and overcome defendants' summary disposition motion. *Id.* at 165. Reiterating the *Skinner* Court's admonition that "[w]e cannot permit the jury to guess," *id.* at 166, we therefore conclude that the trial court did not err in granting summary disposition in favor of defendants.

Affirmed.