*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

JAMES BISHOP,

      Plaintiff/Counterdefendant-Appellant,

UNPUBLISHED
April 16, 2020

v

No. 346256
Wayne Circuit Court
LC No. 16-015947-CZ

PRIME HEALTHCARE SERVICES—GARDEN
CITY, LLC, also known as GARDEN CITY
HOSPITAL,

      Defendant/Counterplaintiff-Appellee,

and

BARBARA COLDREN and SUSAN KARASINSKI,

      Defendants-Appellees.

Before: SAWYER, P.J., and LETICA and REDFORD, JJ.

PER CURIAM.

Plaintiff appeals by leave granted from the trial court's order granting summary judgment in favor of defendants pursuant to MCR 2.116(C)(8) and (C)(10). We affirm.

## I. FACTS

Plaintiff is an instructor with the American Heart Association (AHA), certified to teach basic life support (BLS), advanced cardiac life support (ACLS), pediatric advanced life support (PALS), cardiopulmonary resuscitation (CPR), automated external defibrillator (AED), and first aid. In early June 2016, defendant Barbara Coldren, nurse manager for defendant Garden City Hospital (GCH), contacted plaintiff and arranged for him to instruct more than 20 GCH emergency room nurses for certification in PALS. On July 21, 2016, as arranged, plaintiff instructed a PALS class in the Harrison Building at GCH for approximately 22 of the hospital's emergency department nurses.

-1-

Plaintiff asserted that, because of the size of the class, two additional instructors were scheduled to assist him, but both canceled at the last minute. The two instructors, however, both testified that they knew nothing of that class and did not participate, and one of them disclaimed being an instructor for such purposes at all.

Plaintiff also asserted that, during the class, he discovered that certain video equipment was malfunctioning, which left him unable to show parts of a DVD as recommended by the AHA for PALS certification. Further, the class normally required 8 to 10 hours to complete, but plaintiff did so in under 4 hours.

Plaintiff submitted AHA forms to his training center, stating that the additional two instructors were present, and that approximately 22 nurses were properly instructed in PALS. There was no mention that he lacked the proper video equipment, or that he taught the class in less than 4 hours.

The nurses who attended subsequently received certification completion cards for that class. However, one GCH nurse who was placed on the class list as passing it testified that she met plaintiff on July 23, 2016, talked to him for less than an hour, and never attended an actual PALS class, but that plaintiff nonetheless provided her with a PALS completion card in exchange for $200.

Instructors from Select Medical, an AHA-sponsored training center, received anonymous complaints from nurses who attended plaintiff's July 21, 2016 PALS class regarding its short duration and abnormal student-to-instructor ratio. On August 26, 2016, a representative from Select Medical contacted GCH's nurse educator, defendant Susan Karasinski, and its emergency department director, suggesting that plaintiff did not conduct the July 21, 2016 PALS class in accordance with AHA criteria, that plaintiff could lose his teaching credentials, and that his prior certification cards would then be invalidated, and likened the situation to an earlier one involving a different instructor.

On August 30, 2016, the AHA sent a letter to defendant Karasinksi stating that it was invalidating the July 21, 2016 PALS class. Plaintiff's AHA sponsor then recommended to the AHA that plaintiff be placed on a year's probation in connection with teaching BLS, ACLS, and PALS.

Plaintiff declined to refund what he had been paid for the class in question, but offered to re-teach it. GCH declined that offer, and conducted its own investigation. GCH initially decided not to accept any of plaintiff's certification completion cards, and defendant Coldren sent e-mails to GCH employees stating that all staff who had taken PALS, BLS, and ACLS classes with plaintiff would have to retake the classes. Defendant Karasinski in turn sent an e-mail to two GCH employees stating that she was informed that "AHA contacted other hospitals to inform them the AHA cards are invalid for the classes [plaintiff] taught." Coldren explained to one employee who protested having to repeat classes that "the AHA will not recognize the BLS ACLS or PALS classes" and "GCH will not except [sic] any of [plaintiff's] cards," and explained to another such employee that "[a]ll [PALS] are no good if they have [plaintiff's] name on it," and that this would be effective going back "[f]orever."

The representative from Select Medical testified that he did not tell GCH that the "AHA is not recognizing cards issued by [plaintiff]," but rather that "it sounded like the [AHA] was not going to recognize cards from that PALS course." He also asserted that he never stated the AHA was calling other hospitals about plaintiff and invalidating his certification cards, but rather that "the [AHA] may call other hospitals if they find out, through [plaintiff's] training center, that [plaintiff] taught at others and ask" if those classes satisfied AHA criteria.

In October 2016, after GCH completed its investigation, it determined that it would indeed accept completion cards from plaintiff, with the exception of those relating to the July 21, 2016 PALS class. GCH thus required only the nurses who attended the latter class to take the class again for recertification. Thereafter, GCH began requiring that all hospital staff participate in the AHA's Resuscitation Quality Improvement (RQI) continuing education program. GCH required each employee to have current valid certifications, including BLS, PALS, and ACLS before starting the RQI program. Many GCH nurses holding current certifications from plaintiff were allowed to begin the RQI program with the certifications issued by plaintiff.

Plaintiff asserted that in late August of 2016 he began receiving phone calls from former students who were asking for refunds from previous courses that he taught because GCH informed them that no certification card ever issued by plaintiff would be recognized by the AHA. Plaintiff further asserted that his reputation as an instructor had been "irreparably damaged," and his ability to earn a living eroded, as a result of defendants' statements.

Plaintiff brought this action, pressing claims of defamation, tortious interference with a business relationship or expectancy, and intentional infliction of emotional distress. Defendants successfully moved the trial court to dismiss plaintiff's case pursuant to MCR 2.116(C)(8) (failure to state a claim) and (C)(10) (no genuine issue of material fact).[1] This appeal followed.

## II. STANDARDS OF REVIEW

A trial court's decision on a motion for summary disposition is reviewed de novo. *Corley v Detroit Bd of Ed*, 470 Mich 274, 277; 681 NW2d 342 (2004). A motion under MCR 2.116(C)(8) tests whether the plaintiff has stated a claim upon which relief can be granted on the basis of the pleadings alone. *Id.* A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint, and the court considers the entire record, including affidavits, pleadings, depositions, admissions, and other evidence in a light most favorable to the nonmoving party. *Corley*, 470 Mich at 278. "The moving party has the initial burden of supporting its position with documentary evidence, but once the moving party meets its burden, the burden shifts to the nonmoving party to establish that a genuine issue of disputed fact exists." *Peña v Ingham Co Rd Comm*, 255 Mich App 299, 310; 660 NW2d 351 (2003). Judgment as a matter of law is appropriate when the evidence gives rise to no genuine issue of material fact. *Karbel v Comerica Bank*, 247 Mich App 90, 97; 635 NW2d 69 (2001).

---

[1] The trial court also awarded defendant Garden City Hospital $4,400 to cover reimbursement it provided to its nurses who paid to attend the invalidated class plaintiff conducted. On appeal, plaintiff does not alternatively challenge that facet of the result below.

### III. DEFAMATION

Plaintiff argues that he set forth a prima facie case of defamation. We disagree. The elements of that tort are "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence . . . , and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by publication." *Mitan v Campbell*, 474 Mich 21, 24; 706 NW2d 420 (2005).

Plaintiff argues that the false and defamatory statements concerning plaintiff were that the AHA would not recognize any certification he ever provided, and that the AHA was notifying other area hospitals that plaintiff's certifications were invalid. Plaintiff further asserts that the unprivileged communication was to GCH employees, and that fault resulted from defendants' negligent lack of factual bases for concluding that the damaging statements were true. And plaintiff argues that the statements were defamation per se on the ground that they related to plaintiff's business, and thus that he need not prove specific damages. See *Heritage Optical Ctr, Inc v Levine*, 137 Mich App 793, 797; 359 NW2d 210 (1984).

This jurisdiction has traditionally followed the substantial truth doctrine with regard to the veracity of allegedly defamatory statements. Our Supreme Court stated as follows:

> The common law has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail. For example, the Restatement of Torts provides that '[s]light inaccuracies of expression are immaterial provided that the defamatory charge is true in substance.' Michigan courts have traditionally followed this approach. At early common law, Michigan courts predicated a claim for libel on the question whether the article was substantially true. . . [T]his Court explained that liability could not be imposed for a slight inaccuracy:
>
>> It is sufficient for the defendant to justify so much of the de-famatory matter as constitutes the sting of the charge, and it is un-necessary to repeat and justify every word of the alleged defamatory matter, so long as the substance of the libelous charge be justi-fied. . . . [A] slight inaccuracy in one of its details will not prevent the defendant's succeeding, providing the inaccuracy in no way al-ters the complexion of the affair, and would have no different effect on the reader than that which the literal truth would produce. . . .
>
> Thus, the test looked to the sting of the article to determine its effect on the reader; if the literal truth produced the same effect, minor differences were deemed immaterial. [*Rouch v Enquirer & News of Battle Creek*, 440 Mich 238, 258-259; 487 NW2d 205 (1992), quoting *McAllister v Detroit Free Press Co*, 85 Mich 453, 460-461; 48 NW 612 (1891).]

Plaintiff asserts that the literal truth is that he has issued hundreds, if not thousands, of valid certification cards since 2009, and that the AHA invalidated only one class he taught for failure to meet minimum standards. He argues that defendants' statements were more than "slightly

-4-

inaccurate" under the substantial truth test, because they turned the truth about one mistake plaintiff made after seven years of teaching and providing valid certifications into a blatant lie about the AHA's not accepting any certifications ever issued by plaintiff and calling area hospitals to so notify them.

We conclude, however, that the statements of which plaintiff makes issue do meet the test for application of the substantial truth doctrine. Again, that test looks to "the sting of the article to determine its effect on the reader; if the literal truth produced the same effect, minor differences [are] deemed immaterial." *Rouch*, 440 Mich at 259. Here, the evidence indicates that the literal truth of plaintiff's actions in connection with the July 21, 2016 PALS class would produce the same, or possibly a worse, effect on a person receiving the information than did defendants' slightly inaccurate statements.

Defendants' statements were inaccurate insofar as they asserted that none of plaintiff's class certifications would be accepted by the AHA, and that the AHA was calling other area hospitals to so inform them. But the representative from Select Medical was defendants Coldren's and Karasinski's source for that information; he admitted telling them that the AHA *might* invalidate all of plaintiff's previous class certifications as they had with a previous instructor, and that the AHA *might* call area hospitals to investigate plaintiff's other classes. Through the course of the GCH investigation, Coldren and Karasinski may have misrepresented the Select Medical representative as reporting that the AHA was categorically refusing to accept plaintiff's class certifications, and was actually calling area hospitals to so inform them, instead of as saying that the AHA *might* invalidate plaintiff's class certifications and *might* call other hospitals merely to investigate further. Regardless, by the end of its investigation, in October 2016, GCH decided to accept all of plaintiff's completion cards but for PALS certifications stemming from the July 21, 2016 class.

The literal truth was that plaintiff's class at issue was the only one the AHA invalidated, and the AHA was not calling area hospitals to investigate plaintiff. However, defendants point out that the evidence indicates that plaintiff in fact accepted payment for a PALS class for which he failed to provide the required number of instructors or proper equipment and engaged the students for less than half the time required. Plaintiff then falsified AHA forms he submitted to his AHA sponsor by claiming that two additional instructors completed the complement of instructors, where both testified that they were not present and knew nothing of the matter. The literal truth also includes that the AHA officially invalidated the class on August 30, 2016, and that the training center sponsoring plaintiff's teaching of the PALS class thereafter recommended to the AHA that plaintiff be placed on one year's probation in connection with teaching PALS, BLS, and ACLS. And one nurse attested without contradiction that she did not attend plaintiff's class but received a PALS completion card from him for it, in exchange for $200.

The "sting" of the literal truth as stated above should produce the same, or possibly a worse, effect on the readers of defendants' statements of which plaintiff makes issue. Thus, those statements were substantially true under the substantial truth doctrine. Further, the inaccuracies originated with the comments of the representative from Select Medical, a nonparty, which defendants Coldren and Karasinski may have slightly misinterpreted or miscommunicated during the course of the hospital's investigation. There is no genuine issue of material fact, and plaintiff has failed to state a claim for defamation because defendants' statements were substantially true. For the same reasons, plaintiff cannot prove defamation per se.

## IV. INTERFERENCE WITH A BUSINESS RELATIONSHIP OR EXPECTANCY

Plaintiff argues that he has established a claim for tortious interference with a business relationship or expectancy. We disagree. The elements of that tort are (1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the defendant, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damages. *Badiee v Brighton Area Sch*, 265 Mich App 343, 365-366; 695 NW2d 521 (2005). "To establish that a lawful act was done with malice and without justification, the plaintiff must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *Id.* (quotation marks and citation omitted). Actions undertaken for legitimate business reasons do not constitute improper motive or interference. *Id.*

Plaintiff points out that defendants were aware of his business relationships with the clients for whom he provided classes, and required all GCH staff who held certifications from plaintiff to retake their classes, and asserts that they lied about the AHA's refusing to accept any of his certifications and calling other hospitals to so inform them. According to plaintiff, these false and malicious statements resulted in a loss of a continued business relationship and future expectancy with his clients.

However, we conclude that plaintiff cannot show "with specificity, affirmative acts by the defendant[s] that corroborate the improper motive of [defendants'] interference," or that defendants' actions were not "motivated by legitimate business reasons." *Badiee,* 265 Mich App at 365-366.

Defendants were responsible for the quality of care rendered in the hospital, and part of that duty was assuring the appropriate education of emergency department nurses. Defendants' statements were in furtherance of that goal. The statements were offered in electronic communications to their employees only, and related to the proper education and certification of nurses. They were substantially true, and the inaccurate parts were based on information received from outside sources. The evidence thus does not support an inference of improper motive or interference.

Plaintiff also cannot prove resultant damages. As noted, two months after plaintiff conducted the invalid PALS course, GCH converted the education of its staff to an online-based approach. The program involved specifically provides ongoing training and education for AHA courses, including BLS and ACLS. Accordingly, plaintiff cannot prove that he had an expectancy of teaching GCH staff any AHA courses after the new online approach was implemented. Because plaintiff produced no evidence indicating damages related to an alleged tortious interference with a business relationship or expectancy, the trial court properly dismissed that claim as a matter of law.

## V. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Plaintiff asserts that he has established a prima facie case of intentional infliction of emotional distress. Again, we disagree. In order to establish a claim on that theory, "the plaintiff must present evidence of (1) the defendant's extreme and outrageous conduct, (2) the defendant's intent or recklessness, (3) causation, and (4) the severe emotional distress of the plaintiff." *Dalley v Dykema Gossett, PLLC*, 287 Mich App 296, 321; 788 NW2d 679 (2010) (quotation marks and

citation omitted). Extreme and outrageous conduct for this purpose is conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Dalley,* 287 Mich App at 321 (quotation marks and citations omitted). An actionable case of intentional infliction of emotional distress is generally "one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to scream, 'Outrageous!' " *Sawabini v Desenberg*, 143 Mich App 373, 383; 372 NW2d 559 (1985) (quotation marks and citations omitted). It is initially for the court to determine whether the alleged conduct may be regarded as so extreme and outrageous as to permit recovery, and in doing so, the court should consider the circumstances involved. *Id.*

In this case, plaintiff characterizes defendants' allegedly defamatory statements as extreme, outrageous, and intentional, and asserts that they irreparably damaged his reputation and earning capacity, thus causing him ongoing severe emotional distress. We do not find this argument persuasive, but rather hold that the statements in evidence were neither extreme and outrageous conduct, nor reflective of an intent to cause distress. Again, defendants were responsible for assuring the appropriate education and certification of their nurses, and so had good reason to express their concerns about plaintiff's role in those matters. The statements were substantially true, with any inaccuracies originating with outside sources. There is thus no evidence of extreme or outrageous conduct, or of an intent to cause distress.

Moreover, plaintiff cannot prove causation, because any emotional distress he suffered was logically the result of his own actions in connection with his conduct of the July 21, 2016 PALS class, and the AHA's subsequent invalidation of it. When asked on deposition what kind of emotional distress he suffered as a result of the invalidation of the class, plaintiff responded as follows:

> That's the first time I've ever had a class invalidated . . . That was a big— and the fact that I wasn't allowed to stand by my work and be retaken of the class and just try to be a good business to a customer, to the students, it was a pretty heavy blow to my self-esteem . . . . And just teaching in general since then has been different and people have noticed it. You know, I'm usually someone that they can count on for everything, you know, a lot of things . . . .

But the invalidation of the class resulted from his own conduct, not from what defendants said about it. And plaintiff further testified that he had not suffered any physical manifestations of his emotional distress. Because plaintiff has failed to establish a genuine issue of material fact concerning whether he suffered damages as the result of defendants' statements about him, the trial court properly dismissed his claim of intentional infliction of emotional distress as a matter of law.

Affirmed.

/s/ David H. Sawyer
/s/ Anica Letica
/s/ James Robert Redford

-7-