*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

ALBERT SOBOTKA,

Plaintiff-Appellee/Cross-Appellant,

v

OLYMPIA ENTERTAINMENT, INC.,

Defendant-Appellant/Cross-Appellee.

UNPUBLISHED
February 14, 2025
10:40 AM

No. 366281
Wayne Circuit Court
LC No. 22-004643-CD

Before: YOUNG, P.J., and GARRETT and WALLACE, JJ.

PER CURIAM.

In this wrongful-termination action, defendant, Olympia Entertainment, Inc., appeals by leave granted[1] the trial court's order granting in part and denying in part its motion for summary disposition. Plaintiff, Albert Sobotka, cross-appeals the same order.

The two claims at issue in this appeal are plaintiff's claim of age discrimination and plaintiff's claim of disability discrimination. On appeal, defendant challenges the trial court's denial of its motion for summary disposition with respect to the age-discrimination claim, while plaintiff on cross-appeal challenges the trial court's grant of summary disposition on the disability-discrimination claim. Because we discern no errors requiring reversal, we affirm.

## I. BASIC FACTS

Plaintiff started working with defendant (or defendant's predecessor)[2] in the 1970s as a maintenance worker at Olympia Stadium, where the Detroit Red Wings played professional

---

[1] *Sobotka v Olympia Entertainment, Inc*, unpublished order of the Court of Appeals, entered September 20, 2023 (Docket No. 366281).

[2] The company has changed names multiple times over the decades. When plaintiff started working with the Red Wings in the 1970s, the company was called Olympia Arenas, which was later changed to Olympia Entertainment. After that, it seems that the company may have changed

hockey.  Since 1979, plaintiff held the title of Operations Manager and was primarily responsible for maintaining the ice for the playing and practice rinks.  Plaintiff was well known for driving the Zamboni around and picking up tossed octopi from the ice surface during the playoffs.  The Red Wings even created a mascot for the playoffs named "Al the Octopus."

Plaintiff had less than 10 workers that helped him work on the ice, and they were colloquially called the "ice crew."  Before his February 2022 termination, plaintiff reported to Jim Bullo, who was the Director of Operations at Little Caesars Arena (LCA).  Bullo, in turn, reported to Tim Padgett, who reported to Keith Bradford.  Plaintiff's performance evaluations over the years have been quite good, including the one that concluded for the 2021 calendar year.

The employment handbook at the pertinent time provided the following regarding "prohibited misconduct":

> The purpose of the section below is to provide colleagues with clarity regarding acts and omissions considered inappropriate by Olympia Entertainment, and which may lead to disciplinary action up to and including termination of employment.  Neither this provision, nor any other provision in this Handbook, is intended to negate the existence of the at-will employment relationship.
>
> It is not possible to list all the forms of behavior that are considered unacceptable; however, below are examples of acts and/or omissions which constitute unacceptable on-the-job conduct and which may result in disciplinary action, up to and including termination of employment, depending on the circumstances.  While a colleague may be terminated at will by the company, the company may choose to exercise its discretion to utilize forms of discipline that are less severe than termination.  Examples include oral or written warnings, suspension from work without pay (consistent with all applicable wage and hour laws), periodic performance reviews or performance improvement plans, and reassignment of responsibilities.  Although one or more of these steps may be taken in connection with a particular colleague, the company may terminate the employment relationship without following any particular series of steps whenever it determines, in its sole discretion, that such action is appropriate.[3]

*  *  *

---

its name to Ilitch Sports + Entertainment.  But it is not entirely clear from the record what Ilitch Sports + Entertainment is.  Some witnesses described it as a name change, while another described it as a "brand."  Regardless, defendant is not arguing that it is not the proper party.

[3] The handbook then lists three pages of examples of inappropriate conduct.  There is no dispute that "urinating in an open workspace" is not listed.  However, there are multiple references to the list being nonexhaustive, and it does mention "indecent conduct," which arguably applies to this situation.

. . . The Company is not required to provide any form or [sic–of] progressive discipline, and, in its sole discretion, has the right to terminate a colleague for violation of any of its company policies, or any other lawful reason, at any time, even for a first offense.

In anticipation of a doubleheader event that was occurring on February 12, 2022,[4] the company held a meeting regarding the transition that would occur between events, i.e., getting the venue set up for each event. The meeting was conducted remotely via videoconference in late January 2022 (around January 28, 29, or 30, 2022). Plaintiff testified that, at some point on the call, Padgett told plaintiff something to the effect of "you're just old," "you're getting old," or "you're old."[5] Plaintiff did not think Padgett was joking, was shocked by the comment, and responded with something like, "That's funny."

A few days later on February 2, 2022, the Red Wings were scheduled to host a home game. Plaintiff had just completed surfacing the ice with a Zamboni that morning before the teams had their practice sessions. After parking the Zamboni in the garage,[6] plaintiff urinated into what is known as a "snow pit" or "ice pit," which is a drain that spans across the front of the parked Zambonis in the garage – it is rectangular, approximately 20 feet long and 5 feet wide.[7] After the Zambonis shave off ice layers from the skating surface, the collected ice[8] is then dumped from the Zambonis into the drain. When plaintiff urinated into the drain, he was standing on the ledge of the drain at the left front corner of the left Zamboni, with his back to the doorway of the garage.

Unbeknownst to plaintiff, Matt Hartkopf, one of plaintiff's direct reports, walked by the outside of the Zamboni room while plaintiff was urinating. From the main corridor, when Hartkopf looked thorough the doorway, he saw plaintiff urinating into the drain.[9] Hartkopf later that evening

---

[4] Specifically, there was a Detroit Red Wings hockey game scheduled in the afternoon and a collegiate hockey game scheduled for that evening.

[5] Padgett in his deposition denied making the remark.

[6] The garage houses two Zambonis.

[7] Plaintiff alleges to have felt the sudden urgent need to urinate, due to his then-untreated prostate issue, and did not want to urinate in his pants. He testified that he had suffered similar bouts of urgency at work, prior to the date of the subject incident, and that he had managed to run about 40 feet to the restroom, barely arriving in time. He testified that the distance he would have had to travel to the restroom on February 2, 2022 was about twice as far away as it had been on those prior occasions.

[8] There is no dispute that the collected ice is dirty. In fact, due to the nature of hockey, there can be blood, sweat, spit, phlegm, and other items in the ice that is placed in the drain.

[9] There are two doorways connecting the Zamboni garage with the main corridor. There is a large overhead garage-style door for the Zambonis, and there is a regular doorway for people to the left of the overhead door. Hartkopf described that when he looked through the regular door, he saw

sent an e-mail to Jasmine Howard, who was part of defendant's Human Resources (HR) Department, about what he witnessed.[10]

Howard, in turn, talked with Michele Bartos, who was the Senior Vice President of HR, and Bartos directed Howard and Bullo talk to plaintiff about the allegation. During that conversation, which took place on February 4, 2022, plaintiff freely admitted to urinating in the drain. Plaintiff indicated that it was not a "big deal" and that it was a common practice among the crew. Plaintiff was informed that he was being suspended for a week "pending further investigation" and was escorted out of the building.[11]

When Bartos heard that plaintiff claimed that urinating in the drain was a common practice, she instructed Howard to interview plaintiff's staff. Bullo and Howard's interview of the staff confirmed that at least two maintenance workers and a supervisor had heard that people urinated into the drain at Joe Louis Arena, but the interview did not reveal that anyone else had done likewise at LCA.[12] During the investigation, Howard on February 8, 2022, contacted plaintiff to reiterate the "seriousness" of the offense and offered him the opportunity to name who else had engaged in similar behavior; plaintiff declined to name anyone. Minutes after this conversation, plaintiff called Howard back and stated that he had gone to the doctor and had been diagnosed with a "prostate issue."[13] Howard relayed to Bartos what plaintiff mentioned. Bartos, in turn, talked to Bullo and Padgett about whether they were aware of such an issue, and they were not. No one in defendant's organization followed up with plaintiff on his claim.

Before a decision was made to terminate plaintiff's employment, there were many meetings that were held. Bartos provided a recommendation to Bradford that plaintiff be terminated because "it was misconduct, it was unprofessional, and it was poor judgment from a manager level. We have an expectation level that our managers conduct themselves in a certain way." Bullo and

---

plaintiff's back, but he also could see through the gap between plaintiff's legs a stream of urine going into the snow/ice drain.

[10] Hartkopf also complained about another "issue" regarding plaintiff, but HR deemed that allegation unfounded – that allegation is not part of defendant's decision to terminate plaintiff and is not pertinent for this appeal.

[11] The direction to issue the suspension and have plaintiff escorted out of the building came from Bartos.

[12] We note that before moving into the LCA in 2017, the Detroit Red Wings had played at Joe Louis Arena since 1979. Before 1979, the team played at historic Olympia Stadium, which is where defendant derives its name.

[13] Plaintiff was later diagnosed with benign prostate hyperplasia (BPH). As plaintiff's urologist explained, all men's prostates grow as they grow older. In some men, however, this growth can put pressure on the bladder and cause urinary symptoms, such as sudden urges to urinate. The urologist prescribed two medications for plaintiff, which, according to plaintiff, have significantly improved his symptoms.

Padgett also recommended that plaintiff be fired.[14] Bradford testified that he was the ultimate decision-maker and fired plaintiff. Bradford stated that he made the decision to terminate once he learned that the urination occurred; he did not consider any purported prostate issue. He explained that, in his mind, urinating in an open space at work with the potential for other people to observe is a terminable offense that cannot be allowed. Plaintiff was notified on February 17, 2022, that his employment was terminated effective immediately. David Jones, who was 38 years old at the time (i.e. 29 years younger than plaintiff) and working in another area of the company, was hired to fill plaintiff's position.[15]

Plaintiff filed his lawsuit on April 19, 2022. The only pertinent counts are plaintiff's claim of age discrimination in violation of the Elliott Larsen Civil Rights Act (ELCRA), MCL 37.2101 et seq., and plaintiff's claim of discrimination of a disability in violation of the Persons With Disabilities Civil Rights Act (PWDCRA), MCL 37.1101 et seq.[16]

Defendant moved for summary disposition under MCR 2.116(C)(10). Regarding the age-discrimination claim, defendant argued that, assuming plaintiff could prove a prima facie case, he could not show that the proffered reason for his termination—urinating at an open work space— was pretextual. Defendant averred that there was no evidence that Bradford, the decision-maker, had any age-related animus toward plaintiff or that he was influenced by Padgett, who allegedly made the age-related comment. With respect to the disability-discrimination claim, defendant argued that plaintiff's claim fails as a matter of law because (1) he is not disabled, (2) defendant was not aware of any disability, and (3) in any event, plaintiff cannot show how the proffered reason for termination was pretextual.

In response, plaintiff argued that he could show pretext through Padgett's comments to plaintiff that he was "old." Plaintiff also argued that he could establish pretext by showing that the reason defendant gave was not the actual factor motivating the decision. Plaintiff maintained that his excellent 50-year history with the company weighs heavily in finding that the proffered reason for termination was pretextual. Further, plaintiff asserted that the fact that defendant opted to not use progressive discipline is a relevant factor that weighs in favor of pretext. Finally, he argued that contradictory statements made by Bradford and Padgett support his argument that the incident regarding the drain was a pretext for firing him because it lacked "all credibility." Regarding the disability-discrimination claim, plaintiff argued that he established a prima facie case under a "perceived as" or "regarded as" theory under the PWDCRA because defendant knew

---

[14] Viewing the evidence in a light most favorable to plaintiff, Padgett did recommend, or at least voiced support, for plaintiff's firing. Although Padgett at one point denied making any such firing "recommend[ation]," elsewhere in his deposition, he mentioned that he had expressed his thoughts and was in favor of termination and that he told both Bullo and Bradford it was a terminable offense. The natural inference is that Padgett indeed shared his opinion that plaintiff be fired. Whether that is construed as a "recommendation" or a mere "expression of an opinion" is to make a distinction without a recognizable difference in our view.

[15] Jones had previous experience with the company working on the ice at Joe Louis Arena.

[16] A third count of retaliation in violation of the PWDCRA also was alleged, but plaintiff voluntarily dismissed that claim, leaving only the two discrimination claims.

of plaintiff's prostate issue at the time of his firing. Plaintiff also contended that the same evidence of pretext under the age-discrimination claim applies to this claim.

The trial court in the motion hearing denied defendant's motion with respect to the age-discrimination claim, stating:

> Plaintiff can establish a prima facie case of age discrimination. He's met all the elements.
>
> Defendant has articulated a non-discriminatory reason for its decision to terminate Plaintiff. However, I do find that's a question of fact, whether this non-discriminatory reason is a pretext for age discrimination, given the severity of the discipline.

But the court granted the motion with respect to the disability-discrimination claim because there was no evidence that the decision-maker perceived plaintiff as disabled.

## II. SUMMARY DISPOSITION

This Court reviews a trial court's decision on a motion for summary disposition de novo. *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008). A motion brought under MCR 2.116(C)(10) tests the factual support for the claim. *Spiek v Dep't of Transp*, 456 Mich 331, 337; 572 NW2d 201 (1998). "In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). The motion should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Kisiel v Holz*, 272 Mich App 168, 170; 725 NW2d 67 (2006).

## A. AGE-DISCRIMINATION CLAIM

The ELCRA prohibits employers from discriminating against employees on the basis of, among other things, age. MCL 37.2202(1)(a). "The ultimate question in an employment discrimination case is whether the plaintiff was the victim of intentional discrimination." *Hecht v Nat'l Heritage Academies, Inc*, 499 Mich 586, 606; 886 NW2d 135 (2016). A plaintiff can establish a claim of discrimination through direct or circumstantial evidence. *Hazle v Ford Motor Co*, 464 Mich 456, 462-466; 628 NW2d 515 (2001).

When there is no direct evidence of discrimination, as plaintiff concedes is the case here, Michigan courts employ the familiar burden-shifting approach set forth in *McDonnell Douglas v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), which requires a plaintiff to prove by circumstantial evidence that he was unlawfully terminated by the defendant. *Hazle*, 464 Mich at 462-463. Under this approach, a plaintiff must first offer a "prima facie case" of discrimination. *Id*. at 463. A plaintiff must prove that (1) he is a member of a protected class, (2) he was subjected to an adverse employment action, (3) he was qualified for the job, and (4) the job was given to

another person under circumstances giving rise to an inference of unlawful discrimination.[17]  *Id*. In its motion for summary disposition, defendant accepted that plaintiff could establish a prima facie case.[18]

Once a plaintiff presents evidence to establish a prima facie case, the defendant is then required to articulate a legitimate, nondiscriminatory reason for the termination.  *Id*. at 464. Defendant easily accomplished this when it cited plaintiff's urinating in the open workplace as the reason for the termination.

If the defendant meets this requirement, the rebuttable presumption of a prima facie case "drops away," and the burden returns to plaintiff to show that defendant's articulated reason was mere pretext.  *Id*. at 465-466.  Pretext can be established by showing that the proffered nondiscriminatory reason of the adverse employment action (1) had no basis in fact, (2) was not the actual factor motivating the decision, or (3) was insufficient to justify the decision. *Major v Village of Newberry*, 316 Mich App 527, 542; 892 NW2d 402 (2016).

Although plaintiff avers that he can prove pretext by showing that the proffered reason had no basis in fact, we disagree.  Plaintiff relies on various management personnel describing his urination as taking place "publicly" or in "public" to show that the reason had no basis in fact. Plaintiff maintains that the back of the Zamboni garage is not a "public" area, i.e., members of the public were not permitted to be around the area at that time and plaintiff testified that the only people who would have ordinarily been in the garage at that time in the morning were three or four male members of the ice crew.  Bradford equated "public" to being "an open environment in the workplace."  While others may quibble with Bradford's interpretation of the word, it is clear that the relied-upon fact of plaintiff urinating in the drain in the Zamboni garage was based in fact. Management was not under the impression that anyone but Hartkopf witnessed the incident. Whether management viewed this incident as being "public" is not pertinent.  Therefore, plaintiff cannot show pretext through this method.

Next, is the issue of whether plaintiff presented evidence that his urinating in the snow/ice drain was not the actual factor motivating the decision.  Plaintiff suggests that this is the case based on evidence that Padgett commented on him being "old" just a few days before the urination

---

[17] Alternatively, the fourth element can be established by showing that the defendant treated a similarly situated person not in the protected class differently than him. *Town v Mich Bell Tel Co*, 455 Mich 688, 695; 568 NW2d 64 (1997).

[18] As such, to the extent defendant argues on appeal that its motion should have been granted on the basis that plaintiff cannot prove a prima facie case, that argument is waived.  Defendant never sought summary disposition on this ground, and defendant cites no law requiring a trial court to address issues or arguments not presented.  Furthermore, because the argument was not raised in the trial court, it is unpreserved on appeal and therefore waived.  See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 301; 14 NW3d 472 (2023).

incident.[19]   Defendant argues that the comment is of no consequence because Bradford, the decision-maker, was unaware of it and because Padgett never influenced Bradford's decision. Although there is no evidence that Padgett was responsible for making the decision to terminate plaintiff's employment, there is evidence that he shared his opinion that plaintiff should be terminated with the decision-maker, Bradford.  Further, there is evidence that Bradford testified falsely when he denied that Padgett ever gave him his opinion on the issue of whether plaintiff should be fired.[20]

"[S]ummary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action."  *Eiland v Trinity Hosp*, 150 F3d 747, 752 n 1 (CA 7, 1998), quoting *Dey v Colt Constr & Dev Co*, 28 F3d 1446, 1459 (CA 7, 1994);[21] see also *Jewett v Mesick Consol Sch Dist*, 332 Mich App 462, 473; 957 NW2d 377 (2020) (describing that under a "cat's paw" theory, "discriminatory animus held by a supervisor with no decision-making authority over an affected employee can be attributed to the employer if the biased supervisor's conduct is nevertheless a proximate cause of the adverse employment action").

From Padgett's age-related comment to plaintiff, a jury could infer that Padgett's opinion that termination should occur was impermissibly based, in part, on plaintiff's age.[22]  The question therefore becomes what significance this "tainted" input to Bradford has.[23]  The fact that Bradford may have misrepresented having received an opinion from Padgett weighs in plaintiff's favor because the jury may determine that the misrepresentation, if it occurred, creates an inference that Padgett's opinion affected Bradford's decision to fire plaintiff (i.e., viewing the inconsistent deposition testimony in the light most favorable to plaintiff, the inference is that Padgett told Bradford that he believed plaintiff should be terminated and Bradford falsely denied having received that opinion because he knew that his reliance upon Padgett would support plaintiff's age

---

[19] Although Padgett denied making the comment, we must view the facts in the light most favorable to plaintiff, and plaintiff testified that the comment occurred.

[20] While Bradford denied that Padgett ever gave his opinion on whether to terminate plaintiff's employment, his testimony was directly contradicted by Padgett's testimony (i.e., Padgett testified that he did give Bradford his opinion).

[21] Although not binding, federal precedent generally is considered highly persuasive, and is often consulted for guidance in discrimination cases.  *Wilcoxon v Minnesota Mining & Mfg Co*, 235 Mich App 347, 360 n 5; 597 NW2d 250 (1999).

[22] Defendant relies on *Sniecinski v Blue Cross & Blue Shield of Mich*, 469 Mich 124; 666 NW2d 186 (2003), for the proposition that Padgett's comment was a "stray remark," which should be afforded no weight.  In *Sniecinski*, the plaintiff's reliance on a supervisor's discriminatory remarks was misplaced because there was no evidence that the supervisor's animus was a cause for the adverse employment action.  Instead, it was the operation of a neutral policy that resulted in the adverse employment action. *Id*. at 135-140.  But in this case, unlike in *Sniecinski*, there is evidence that the person who made the discriminatory remark had direct input to the decision-maker.

[23] Taking the evidence in a light most favorable to plaintiff, this Court must infer from his comments that Padgett held age-related, discriminatory animus.

discrimination claim). Although the record shows that virtually everyone involved in the process held the opinion that plaintiff should be terminated, it is up to a jury to decide how much weight it thinks Padgett's comments carried. We note that, at this stage of the proceedings, plaintiff only needs to show that there is a question of fact to survive summary disposition. *Hazle*, 464 Mich at 465 n 10. We therefore conclude that, when viewing the evidence in a light most favorable to plaintiff, there is a question of fact whether Padgett's alleged discriminatory animus provided factual information or other input that may have affected the adverse employment action taken by Bradford. See *Jimkoski v Shupe*, 282 Mich App 1, 5; 763 NW2d 1 (2008) (stating that this Court is liberal in finding genuine issues of material fact).

Defendant also argues that the evidence was inadequate to show that its proffered reason for termination was insufficient to justify the decision. Plaintiff, on the other hand, avers that defendant firing plaintiff for a relatively minor offense and without engaging in any progressive discipline is evidence of pretext. Although a plaintiff can establish pretext by showing that the proffered reason for the adverse employment action was insufficient to justify the decision, the soundness of an employer's business judgment may not be questioned as a means of showing pretext. *Meagher v Wayne State Univ*, 222 Mich App 700, 712; 565 NW2d 401 (1997), citing *Dubey v Stroh Brewery Co*, 185 Mich App 561, 566; 462 NW2d 758 (1990). Defendant deemed it inappropriate for its employees to potentially expose themselves in the workspace, and to use its facilities in the manner plaintiff did, and also thought that those in its management positions should set an example for the company. These are business judgments, which plaintiff cannot challenge as being misguided or illogical as evidence of pretext.

Regardless, as previously noted, plaintiff has presented evidence, through Padgett's age-related comment and Bradford and Padgett's inconsistent sworn testimony, that plaintiff's urinating in the snow/ice drain may not have been the actual factor motivating the decision to terminate. Accordingly, we affirm the trial court's denial of defendant's motion for summary disposition for this count. See *Kyocera Corp v Hemlock Semiconductor, LLC*, 313 Mich App 437, 449; 886 NW2d 445 (2015) ("We will affirm a trial court's decision on a motion for summary disposition if it reached the correct result, even if our reasoning differs.").

## B. DISABILITY-DISCRIMINATION CLAIM

Under the PWDCRA, an employer shall not, among other things, "[d]ischarge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a disability or genetic information that is unrelated to the individual's ability to perform the duties of a particular job or position." MCL 37.1202(1)(b). The Legislature, however, defined the term "disability" to include situations where an individual is "regarded as having a determinable physical or mental characteristic described" under MCL 37.1103(d)(*i*). MCL 37.1103(d)(*iii*). Consequently, an employer can violate MCL 37.1202 by engaging in the practices prohibited under that section if the employer "regarded" the person as having a disability, even if the person did not in fact have a determinable physical or mental characteristic described under MCL 37.1103(d)(*i*).[24] Thus, to set forth a prima facie case of

---

[24] MCL 37.1103(d)(*i*) defines "disability" to be, in pertinent part:

discrimination under a "perceived as" or "regarded as" theory under the PWDCRA, plaintiff must show that (1) defendant regarded him as having a determinable physical or mental characteristic, (2) defendant perceived the characteristic as substantially limiting one or more of plaintiff's major life activities, and (3) defendant regarded the characteristic as being unrelated to plaintiff's ability to perform his duties. *Michalski v Bar-Levav*, 463 Mich 723, 731-732; 625 NW2d 754 (2001).

Plaintiff cannot establish a prima facie case. Even assuming the first prong is met because plaintiff informed Howard that he has a "prostate issue," the second prong cannot be satisfied. There is no evidence that anyone from defendant perceived plaintiff's prostate issue as substantially limiting one or more of plaintiff's major life activities. Plaintiff's base averment that he had a prostate issue—with nothing more—was inadequate to allow an inference that those who learned of this issue regarded it as substantially limiting one or more of plaintiff's major life activities.[25] To do otherwise would be to engage in speculation. See *Karbel v Comerica Bank*, 247 Mich App 90, 97-98; 635 NW2d 69 (2001) (recognizing that although circumstantial evidence can be sufficient to establish a case, it must be more than conjecture and speculation).

Plaintiff relies on *Workman v Frito-Lay, Inc*, 165 F3d 460 (CA 6, 1999), for the proposition that "[a] plaintiff *who sets forth evidence that he must be free to go to the bathroom whenever he feels the urge* is significantly restricted as to the condition, manner, or duration under which he can perform a major life activity and has presented enough to go to the jury on whether he is perceived as disabled." (Emphasis added.) Reliance on this principle is misplaced. In *Workman*, the plaintiff had irritable bowel syndrome, which at one point required her to have bowel movements 10 to 14 times a day. *Id*. at 463. The plaintiff, through her doctor, communicated to the defendant that "it was important for [her] to be able to use the restroom when the urge occurred." *Id*. Here, notably, no similar communication was made to defendant. Instead, someone in defendant's position had to speculate on the ramifications of the issue raised by plaintiff, i.e., when he informed Howard that he had been diagnosed by his doctor with a prostate issue. In turn, one would have to speculate that defendant thought plaintiff's prostate issue rose to the level of affecting a major life activity.

---

A determinable physical or mental characteristic of an individual, which may result from disease, injury, congenital condition of birth, or functional disorder, if the characteristic:

(A) . . . substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

[25] Even plaintiff acknowledges in his cross-appellant brief that "an employer must know enough information about the employee's condition to conclude that he is disabled." There simply is not enough information available to defendant for it to conclude that plaintiff was disabled.

Accordingly, because plaintiff has failed to establish a prima facie case as it pertains to his claim under PWDCRA, the trial court properly granted summary disposition to defendant on this claim.

Affirmed. No taxable costs as neither party prevailed in full.

/s/ Adrienne N. Young
/s/ Kristina Robinson Garrett
/s/ Randy J. Wallace